## HULL *v.* PITRAT *et al.*

### (*Circuit Court, S. D. Ohio, W. D.* January 24, 1891.)

1. SALE—WHEN TITLE PASSES.

The owner of certain patents agreed in writing "to sell and does hereby sell them," for a designated sum in cash, and another sum to be paid a year from date. The purchaser, as part of the purchase price, bound himself to convey to the seller 200 lots within 30 days, with an abstract showing clear title, and also to convey to a trustee the title to other lands to secure the deferred purchase money. The conveyance of the patents was to be placed in escrow with the same trustee, to be delivered to the purchaser on the payment of the entire money consideration. *Held*, that the conveyance of the lots to the seller, the execution of the trust-deed, and the payment of the entire money consideration, were conditions precedent to the vesting of the title to the patents in the purchaser, and that therefore the contract was only an executory contract of sale, and did not operate to pass the title.

**2.** SAME—WRITTEN CONTRACT—SUBSEQUENT PAROL MODIFICATION—EVIDENCE.

When the contract was made, there was a small mortgage on the 200 lots to be conveyed with a clear title as part of the purchase price for the patents. In an action by the purchaser for the specific performance of the contract his testimony conflicted with that of the seller as to a subsequent parol modification of the contract, under which the amount of the mortgage was to be paid to the seller, and he to take a deed subject to the incumbrance. *Held,* that the acceptance of the deed of the lots by the seller without objecting to the incumbrance, and the receipt by him of several sums stated by the purchaser to be on account of the mortgage, were sufficient to establish the modification of the contract as testified to by the purchaser.

**3.** SAME—CASH PAYMENT—EVIDENCE.

Before the contract was executed, the purchaser, with others, had obtained an option on the patents, for which the purchaser had paid the seller $1,000. This sum was to be forfeited if the purchase was not completed by a certain time. After the time so limited had elapsed, the seller waived the forfeiture, and agreed to extend the time in favor of the purchaser. Pending such extension, the contract in question was entered into, which provided for a cash payment of $1,500. The purchaser admitted that he had paid only $500 in cash on the last contract, but testified that it was understood that the $1,000 previously paid formed a part of the cash payment. *Held,* that an unequivocal acknowledgment by the seller, in the contract of sale, of the receipt of $1,500 in cash, was sufficient to establish the purchaser's version of the affair, though denied by the seller.

**4.** SAME—RESCISSION OF CONTRACT.

The fact that the land to be held as security for the payment of the deferred purchase money was never conveyed to a trustee, as provided in the contract, is no ground for the rescission of the sale by the seller, who is himself in default as to the transfer of the patents, and to whom the land was afterwards conveyed directly.

**5.** SAME—ESTOPPEL.

A deposition by the seller, in an action by third persons against the purchaser, that the latter is indebted to him in a certain sum on the contract of sale, is a recognition by the seller that the contract is then in full force and effect, and he cannot subsequently rescind the contract for an alleged default of the purchaser occurring before that time.

**6.** SPECIFIC PERFORMANCE—SALE OF PATENTS.

A contract for the sale of a patent will be specifically enforced in equity, in favor of the purchaser, on the ground that otherwise he may suffer irreparable injury.

In Equity.

The bill is filed for the specific performance of a contract, of which the following is a copy:

"GALLIPOLIS, October 2, 1889.

"It is hereby agreed and understood by and between Julius E. Pitrat, of Gallipolis, Ohio, and Robert E. Hull, of Detroit, Michigan: *First,* that Julius E. Pitrat agrees to sell, and does hereby sell, patent No. 314,717, dated March 31, 1885; patent No. 341,166, dated May 4, 1886; patent No. 344,875, dated July 6, 1886; patent No. 356,077, dated January 11, 1887; patent No. 385,005, dated June 26, 1888,—all the above patents granted by the United States of America for computing and price scales, for $60,000; to the said Robert E. Hull, payments to be as follows: $1,500 cash in hand paid, the receipt of which is hereby acknowledged, and the further sum of $8,500 cash, to be paid on or before one year from this date, with interest at six per cent. on all sums remaining unpaid at the expiration of six months from this date; and all of blocks No. 28, 29, 30, 31, 32, 33, and 34, being about 200 lots, in R. E. Hull's subdivision of Jerome Park, in Wayne county, Michigan, being at the intersection of what is known as the 'Six-Mile Road' (or ditch road) and the Detroit, Grand Haven & Milwaukee R. R.; said Hull to convey this property clear of incumbrance within 30 days, or a reasonable time, with an abstract showing a good title. The said Hull also agrees to convey to a trustee to be agreed upon 940 acres of land (more or less) in Clay county, Arkansas, as a guaranty for the payment of the aforesaid sum of money. It is

also further agreed that the said Pitrat shall make a full conveyance of the before-mentioned patents to the said Robert E. Hull, and place the same in the hands of the same trustee, who shall hold the title to the said 940 acres of land, who shall deliver the said patents to the said Robert E. Hull when he shall pay the said Pitrat the balance of money now remaining unpaid as aforesaid. The said patents are now held by J. S. Blackaller, of Gallipolis, Ohio, as trustee for the said Julius E. Pitrat, and the Detroit Computing Scale Co., of Detroit, Michigan, on a contract which is now forfeited; and this is to instruct the said J. S. Blackaller to so hold the same until otherwise instructed. It is also agreed that the said trustee to be agreed upon shall reconvey the said 940 acres of land to the said R. E. Hull, or his assigns, as he may direct, when he shall make the balance of payments for said patents.

"Signed the day and year before mentioned.

[Signed]                                    "J. E. PITRAT.
[Signed]                                    "ROBERT E. HULL."

This contract was recorded at the patent-office at Washington on the 6th of February, 1890.

The complainant avers full performance on his part, to-wit, the payment of $1,500 cash at the date of the execution of the agreement, as therein recited, and the tender, Thursday, April 10, 1890, to Pitrat, at his residence, at Gallipolis, Ohio, of $9,200 in United States legal-tender notes, commonly called "Greenbacks." This latter sum, he avers, was reached in the following way: There was an incumbrance upon the Jerome Park lots of $1,232.75. The complainant conveyed said lots to Pitrat on the 22d of November, 1889, and the deed was duly recorded in the office of register of deeds of Wayne county, which record was placed upon an abstract of title of the said property at the request of said Pitrat, and the abstract was then delivered to him, showing a perfect title except as to the said incumbrance. Pitrat did not object to the title, nor to the incumbrance, but the written agreement above was by correspondence so modified that Pitrat agreed to receive remittances of money from the complainant in lieu of the complainant's applying such moneys to the payment of the incumbrance, and agreed that in the mean time the incumbrance might remain on the complainant's paying interest, as Pitrat preferred to have the use of the money if the incumbrance would be allowed by the party holding it to remain. According to this modification of the written agreement the complainant, on the 17th of October, 1889, sent to Pitrat $500 by draft on New York, instead of paying it upon the incumbrance, and Pitrat received and accepted it in recognition of the modification of the contract, and in part performance thereof. Subsequently, on December 11, 1889, the complainant, in like manner, sent Pitrat $100, and he received it and treated it as he did the first remittance. The amount tendered by complainant to Pitrat on the 10th of April, 1890, as above shown, included the cash payment, $8,500, provided by the written agreement to be made on or before one year from October 2, 1889, and also the balance of $1,232.75 due on the incumbrance upon the Jerome Park property, and also the sum of $10.50 rent collected by the complainant for Pitrat from the tenant of a house upon part of said property, also all interest upon the incumbrance; and the complainant avers that the amount of said tender exceeded all

of said last-named sums, and fully discharged all obligations upon the part of complainant to Pitrat arising out of said written agreement.

The bill further sets forth that Pitrat was sworn as a witness on behalf of the complainant in a suit in chancery in the Wayne circuit court, Detroit, Mich., in which Fleetward Ward was complainant and this complainant was a defendant, and on January 29, 1890, having been sworn before a competent officer, gave and signed his deposition, wherein he testified that he had sold said patent to complainant, and was satisfied with the sale, and that complainant owed him $7,900; that is to say, the $8,500 payment, less the balance on the incumbrance. Between said date, which is the 29th day of January, 1890, when Pitrat admitted complainant's rights, under oath, as above stated, and the 29th day of March, 1890, two months afterwards, when he deliberately violated complainant's rights by undertaking to sell to the defendant the Dayton Autographic Register Company, with notice as is set forth in that part of the bill, nothing whatever occurred to affect the relations between complainant and Pitrat.

The bill further sets forth that Pitrat did not make a full conveyance of the before-mentioned patents to the complainant, and place the same in the hands of a trustee, according to said agreement, although, after its execution, the complainant nominated to Pitrat as such trustee Alfred F. Moore, of Gallipolis, who had been recommended for that position by Pitrat. In the mean time, however, and after the execution of the agreement, Blackaller, trustee, mentioned in the agreement as holding the legal title to such patents, reconveyed the same to Pitrat, under the latter's instructions so to do, so that Pitrat was fully enabled to perform his contract to convey said legal title to complainant.

After complainant nominated Moore as trustee, as aforesaid, he applied in writing to Pitrat, requesting him to procure Blackaller to reconvey the 940 acres of land in Clay county, Ark., to the complainant, that complainant might convey the same to Moore, as trustee, or to such trustee as might be agreed upon, the conveyance to be as a guaranty for the payment of the consideration money for said patents remaining unpaid. Complainant did this because Pitrat requested a reconveyance from Blackaller, as above stated. Pitrat answered complainant's request by writing to him that Blackaller was not a resident of Gallipolis.

On the 31st of March, 1890, Pitrat, by Thomas S. Jerome, of Detroit, his agent, tendered to complainant a deed of said Clay county lands, executed by Blackaller, trustee, and also a deed of the same lands executed by Pitrat. Jerome at the same time exhibited to complainant a power of attorney from Pitrat, authorizing him to revoke the written agreement of October 2, 1889, above set forth, and at the same time displayed a sealed envelope, and tore open the end of it, saying, "Here is a deed of your Wayne county property, and here is $1,132," but did take out or produce or exhibit any money. Complainant answered that he had always been ready, and was then ready, to carry out his contract with Pitrat, and that he should carry it out, and that he so notified Pitrat through him (Jerome.)

v.45F.no.2—7

On the 10th of April, 1890, Pitrat, when complainant tendered to him $9,200, as above set forth, stated and admitted to the complainant that two days before Jerome called upon complainant, as stated above, that is to say, on Saturday, the 29th of March, 1890, he had conveyed the legal title to said patents by written deed to the defendant the Dayton Autographic Register Company, and that the said company had full knowledge of the written agreement of October 2, 1889, between complainant and Pitrat, and all doings under it, and that, nevertheless, said autographic register company had paid him (Pitrat) for said patents, and without recourse and without any warranty of title from him (Pitrat) to said company, to whom Pitrat stated he had delivered the patents themselves.

The bill charges that the defendant the autographic register company had full notice of all the complainant's rights, and that he was the equitable owner of said patents by virtue of said written agreement, when it accepted and received, as above stated, a conveyance of the legal title of said patents. The complainant avers that said company holds said title in trust for complainant, and that the conveyance to it was by quitclaim only, and therefore that said company is not a *bona fide* purchaser without notice.

The complainant further avers that the defendant Pitrat is financially irresponsible, and that said patents possess a special and peculiar value, and that the loss of the same would entail a damage to the complainant which no authorized measure at the common law would come near satisfying, and that he is advised and submits that he has no plain, adequate, and complete remedy at law; wherefore he prays for a preliminary injunction, which was granted, and upon final hearing for perpetual injunction against the Autographic Register Company, forbidding said company from claiming any title under and by reason of any conveyance from Pitrat as alleged in the bill, and from making or selling the patented article, or doing any business under said patents.

The defendants, by their answer, admit the execution of the contract of October 2, 1889, but deny that the complainant has performed the contract; that he has paid Pitrat $1,500 cash, as stated in the contract; that Pitrat accepted the deed of the Jerome Park lots; that said deed conformed to or was in accordance with the terms of the contract; that Pitrat delivered, or authorized or consented to the delivery of, the deed so imperfectly executed, and made subject to said incumbrance to be recorded; and that he fully accepted said deed. They deny that said written agreement was modified as averred in the bill, or that any modification or change of any kind was ever made in said contract, or that the sums of $500 or $100, or either of them, was paid to or received and accepted by Pitrat in recognition of, or in part performance of, any modification of said contract.

The defendants further deny that Pitrat testified in his deposition, referred to in complainant's bill, that he made an absolute sale of his patents to the complainant, or that the complainant had performed or complied with said contract, and that he (Pitrat) was satisfied therewith,

and admitted complainant's rights.    On the contrary, they aver that the complainant refused and neglected to perform said contract.

They further aver that the reassignment of said patents by Blackaller was received by Pitrat, and by him forwarded to the patent-office at Washington for record, and when returned to Pitrat, in February, 1890, he being dissatisfied with the negligence and indifference of complainant to the performance of his part of said contract, determined, for his own protection, not to place said patents in the hands of another trustee until the complainant should perform his part of said contract by releasing the incumbrance upon the Jerome Park lots, and accordingly he retained possession of said patents.

On the 29th of March, 1890, Pitrat constituted Thomas S. Jerome his attorney, to rescind and revoke said contract of October 2, 1889, and said rescission was made by said Jerome on the 31st of March, 1890, and a tender then made by said Jerome on the 31st of March, 1890, and a tender then made to complainant of all that Pitrat had received from him, to-wit, a quitclaim deed for the Jerome Park lots, a deed from Blackaller, as trustee for the Arkansas lands, and the sum of $1,130.55 in money, being the sum of $500 paid to Pitrat at the date of the contract, $500 sent by complainant to Pitrat October 17, 1889, $100 sent to Pitrat December 11, 1889, together with interest on each of said sums from the respective dates stated to March 31, 1890.

The defendants further answer that Pitrat, on March 1, 1890, notified complainant by letter that he had not made any agreement to receive any payment upon the amount of the incumbrance of the Jerome Park lots, and had not agreed that said incumbrance should remain thereon, and in lieu of its removal the money should be sent by complainant to Pitrat, and then notified complainant that he should like him to remove said incumbrance as he had agreed to do.

They further aver that Pitrat had unsuccessfully urged Hull to remove said incumbrance from said lots, and on February 13, 1890, had notified complainant that his deed for said lots was not acceptable, and would not be received by him; that from and after the 22d of February, 1890, Pitrat received no communication of any kind from the complainant in reference to said agreement, and, having no answer to his letter of March 1, 1890, he regarded the agreement as abandoned by complainant, and that he (Pitrat) was entitled to the rescission thereof, and accordingly that on the 31st of March, 1890, after said rescission, he sold said patents to the defendant the Dayton Autographic Register Company; that the sale was consummated and closed up after said notice of rescission and tender, and the purchase money therefor was paid by the defendant the Dayton Autographic Register Company to Pitrat.

The defendants further aver that complainant utterly disregarded the notice from Pitrat contained in his letter of March 1, 1890, above referred to, and no communication of any kind was received from com- plainant until April 10, 1890, when he made the tender to Pitrat as alleged in the bill; but defendants deny that Pitrat admitted that he had conveyed the legal title to said patent to the Dayton Autographic Regis-

ter Company on March 29, 1890, and had delivered the patents to said company.

The answer admits that the defendant the Dayton Autographic Register Company, having knowledge of the agreement of October 2, 1889, between complainant and Pitrat, and also full knowledge of complainant's default in the performance thereof, and believing that he had abandoned it, and that Pitrat could rescind it, did, on March 31, 1890, after said notice of rescission and tender by Pitrat, pay to him a part of the consideration for said patents and take an assignment thereof, and is now the owner and holder of the same. The defendants further deny that complainant is the equitable owner, or has any interest in said patents.

There are other averments, which may be referred to in the opinion, but it is not necessary to set them forth in the statement of the case.

*Alfred Russell* and *Young & Young*, for complainant.

*John A. McMahon* and *Gottschall & Brown*, for defendants.

SAGE, J., (*after stating the facts as above.*) The first contention between the parties is whether the contract of October 2, 1889, is an executed or an executory contract. Pitrat agreed "to sell, and does hereby sell," to Hull the patents, which are the subject of controversy, for $60,000, payments to be made by Hull, as agreed by him in the contract, of $1,500 cash in hand, the receipt of which is acknowledged, and the further sum of $8,500 on or before one year from the date of the contract, with 6 per cent. interest " on all sums remaining unpaid at the expiration of six months from this date," also 200 lots at Jerome Park, within 30 days, or a reasonable time, with an abstract showing a good title. Hull also agreed to convey the Arkansas lands to a trustee as a guaranty for the money payments. It was also agreed that Pitrat should make a full conveyance of the patents to Hull, and place the same in the hands of the trustee, to whom the Arkansas lands should be conveyed, to be delivered by him to Hull, when he should pay Pitrat the entire money consideration. Upon the authority of the *Elgee Cotton Cases*, 22 Wall. 180, 194, this must be regarded as an executory contract. The court, in that case, approve and adopt the statement of the law by Benjamin in his treatise on Sales, at section 320, as follows:

"Where the buyer is by the contract bound to do anything as a condition, either precedent or concurrent, on which the passing of the property depends, the property will not pass until the condition be fulfilled, even though the goods may have been actually delivered into the possession of the buyer."

The contract required Hull to remove a mortgage incumbrance of $1,232.75 from the Jerome Park lots. It is claimed on behalf of the complainant that the contract was in this respect modified, Pitrat agreeing that, if the holders of the mortgage were willing to let it remain, the money might be paid to him, and he would accept the deed subject to the incumbrance. Pitrat and Hull are in conflict with reference to this modification. It is not disputed that Hull, on the 17th of October,

1889, sent Pitrat $500, and on the 11th of December $100, by draft on New York. Hull testifies that those remittances were made under the modification of the contract, instead of applying them towards the payment of the incumbrance. Pitrat's testimony is that he understood that the money was paid on account of the $8,500, which was to be paid within one year from the date of the contract. The complainant's statement is entitled to the stronger weight, because it is in harmony with the correspondence between him and Pitrat, and with other undisputed facts in evidence. He testifies that before he left Gallipolis, Ohio, where the agreement was drawn and executed, at Pitrat's home, it was understood, after it was signed, that it should be modified as above, provided the mortgage could remain. Almost immediately after his return to Detroit, he wrote to Pitrat, under date October 5, 1889:

"I got here Thursday night about eight o'clock, the train being late. Yesterday I looked up interest on Jerome Park matters. The interest on the part I am to convey to you is not due until the 1st of November, but I shall pay it to-day. They at the bank said they would prefer to have the incumbrance on that property remain, as the security was desirable. I will have the abstract brought down to date as soon as I can, (in a short time,) and send to you. I will also make a deed to the property, and get our business closed."

It appears from the testimony that the bank held the mortgage on the Jerome Park lots.

On the 7th of October, Hull wrote to Pitrat that he could send him $500 at any time. No objection was made by Pitrat to either of these statements. On the contrary, in his letter, acknowledging the offer of the $500, he stated that it would prove very acceptable, for it would "fill up a hole that I have been in a quandary to know how to fill."

Pitrat, in a letter to Hull under date January 6, 1890, referring to his desire to adjust matters with persons to whom he had agreed to convey a part of Jerome Park lots free of incumbrance, requests Hull to obtain a release of the incumbrance from the bank, saying that it would greatly oblige him, and "put him on his feet," but he makes this rather as a request than as a demand as of right under the contract.

Hull, in a letter to Pitrat, dated February 22, 1890, recalls to him that he stated to him on the day of the date of the contract that the incumbrance was drawing only 6 per cent. interest, and could remain as long as desired, and that if he preferred to use the money to having the mortgage paid he would pay it to him, and would pay the interest on his return to Detroit, which he did before it was due, and that Pitrat said that he would prefer the money, and then goes on to recite the facts substantially as stated above, and adds:

"Now, Mr. Pitrat, I was not by our contract to pay you any more money until one year from October 2, 1889. I have paid you some, and will pay you the balance of the amount, $1,232.75, or you may return what I have paid, and I will pay the mortgage. It is immaterial which way I may do. It is so much money either way."

Pitrat did not accept Hull's proposition, nor return the money, and the mortgage incumbrance was not paid.

More than this. Hull mailed the abstract of title to the Jerome lots to Pitrat on the 25th of November, 1889. Counsel for Pitrat calls attention to the fact that in that letter Hull stated that the title was "all right, except we may want a quitclaim deed from the Detroit Savings Bank, which they will give." But what follows immediately makes the meaning perfectly clear:

"This to release a tax-deed which was taken in the interest of George Jerome, of whom I purchased the property, who gives warranty deed, and is worth $1,000,000."

On the 10th of December Pitrat writes to Hull, pointing out errors in the abstract, but there is nothing in that letter in reference to the failure to have the lots released from the mortgage shown by the abstract. In passing it may be remarked with reference to the suggestion that Pitrat is an old and infirm man, subject to be easily duped, that his letter is sufficient evidence of the clearness and strength of his mind, as well as of his business sagacity. These characteristics appear in all his letters, and completely dispose of any suggestion that he was not fully able to take care of his own interests.

On the 13th of December Hull wrote, inclosing his deed for the lots, which he had caused to be recorded. In the same letters he answers Pitrat's suggestion about the errors in the abstract.

On the 16th Pitrat wrote to Hull, acknowledging the receipt of the letter last above. Counsel for the defense say that in this letter Pitrat requested the release of the mortgage incumbrance on the lots. I do not so understand it. He says: "In my last letter I alluded to release deed from the Detroit Savings Bank." He further states that one of his reasons for desiring to have that release at an early date was that he was under contract to convey a certain number of lots, clear of incumbrance. The reference is clearly to the tax-title held by the bank, for that was the matter referred to in his previous letter. He said nothing about the release of the mortgage claim. As his vendee would have the right to insist that every other lot of the 200 should be first sold, and the proceeds applied to its discharge, it was not probably regarded as practically any incumbrance, so far as he was concerned, but the tax-deed was for all the lots, and may have been regarded as a very serious incumbrance. If he had not modified the contract in respect to the mortgage, it was his duty to decline to receive the deed. But he did receive it, and retain it, until he presented it and had it attached to his deposition given in this cause.

It appears from the testimony of Hull that when he made the contract with Pitrat he had money in bank more than sufficient to pay the mortgage on the lots. I cannot understand why, if the mortgage was not to remain, he should pay the interest upon it in advance. He could save nothing in the way of interest by anticipating at that time the payment of any portion of the $8,500, because interest on that sum was not to begin to run until six months after the contract. My conclusion is, therefore, that the contract was so modified as to substitute the payment of

the amount of the incumbrance to Pitrat for the payment of the incumbrance itself. See *Railroad Co.* v. *Trimble*, 10 Wall. 376, 383, where the court, by Justice SWAYNE, says:

"The most solemn contracts under seal, where the statute of frauds is not involved, may be changed or abrogated by a new parol agreement, express or implied; and a contract within the statute may be taken out of it by the conduct of the parties."

The bill is for specific performance. Although generally equity will not decree specific performance of contracts relating to personal property, for the reason that an action for damages affords an adequate remedy; agreements for the assignment of patents, for the delivery of chattels which can be obtained only from the vendors, and for the renewals of leases, will be enforced, on the ground that otherwise irreparable injury may be inflicted. *Hapgood* v. *Rosenstock*, 23 Fed. Rep. 86; *New York, etc., Co.* v. *Union, etc., Co.*, 32 Fed. Rep. 783; *Pennsylvania R. Co.* v. *St. Louis, etc., R. Co.*, 118 U. S. 290, 298, 305, 6 Sup. Ct. Rep. 1094; 3 Rob. Pat. § 1228; *Adams* v. *Messinger*, 147 Mass. 185, 17 N. E. Rep. 491; *Satterthwait* v. *Marshall*, 4 Del. Ch. 337; *Reese's Appeal*, 122 Pa. St. 392, 15 Atl. Rep. 807.

But it is urged that the contract was rescinded. It appears in testimony that on the 29th of March, 1890, Pitrat gave to Thomas S. Jerome, of Detroit, a power of attorney, in which he expressed his desire and intention to rescind and annul the contract, to renounce all rights, claims, and obligations under it, or in any way growing out of it, and to return to Hull every part of the consideration received from him, on the ground that he had utterly failed neglected and refused to carry out his part of the contract. He therefore gave to Jerome full power to return and tender to Hull deeds for the lands conveyed by him, being the Jerome Park lots; also for the lands in Clay county, Ark., which Blackaller had conveyed to him, (at precisely what date does not appear,) and also all the money received from Hull, giving Jerome full power to act for him and do everything necessary in the premises, including the execution of deeds and indentures.

On the 31st of March, 1890, Jerome called on Hull at his office in Detroit, and, having shown him the power of attorney, stated that by virtue thereof he had certain deeds and some money to tender him on behalf of Pitrat, who, he wished to announce, utterly rescinded and annulled the contract of October 2, 1889. Then Jerome handed Hull two deeds, one from Blackaller to Pitrat and one from Pitrat to Hull, of the lands in Clay county, Ark. Hull received these, saying that they were what he wanted, and that he had written for them. Then Jerome handed Hull a deed from Pitrat for the Jerome Park lots, which Hull declined to receive. Jerome then produced an envelope, containing $1,130.55, in legal-tender greenbacks and coin, tearing open the end of the envelope, bringing the bills part way out, and saying, "Mr. Pitrat wishes to return to you the money he has received from you in this matter, with interest to date," and handed him the envelope with the money, stating the amount as above. Hull said he did not question that Jerome had

stated the amount correctly, but declined to receive it, remarking that he did not want it; that it belonged to Pitrat. He claimed also that he had paid Pitrat $2,100. Jerome asked if he included in his estimate $1,000 paid Pitrat in June, 1888, on an option for the purchase of the patents, then held by Mr. Ward and Mr. Wilson. Hull said that he did, and notified Jerome that he was ready to carry out his contract with Pitrat. This notice Jerome declined to receive, on the ground that he was not authorized by Pitrat to receive any notice. Hull, on the other hand, expressly declined to receive the Jerome Park deed and the money, and stated that his contract with Pitrat was in force, and that he should insist upon it. Jerome then deposited the money with McLellan and Anderson, bankers, of Detroit, to the order of Hull, as he notified Hull he would do, to be delivered to him upon his request, and gave him notice thereof. Jerome states in his deposition that at the time of the tender referred to he did not demand from Hull a performance of his contract with Pitrat, and in answer to the question whether he called Hull's attention to any respect in which Pitrat claimed he had not performed, and asked him to perform in that respect, stated that according to his recollection he said that Mr. Pitrat considered that the contract of October 2d had not been carried out by him.

On the same day he telegraphed the substance of his interview with Hull to Mr. Gottschall, of Dayton, who was counsel for the defendant the Dayton Autographic Register Company, which company, Jerome testified, intended to buy Pitrat's patents as soon as he was in position to sell them.

Jerome further testifies that the power of attorney was made and delivered by Pitrat to him at Gallipolis, Ohio, on the 29th of March, 1890, Mr. Gottschall being present, as attorney for the register company, with Mr. Crume and Mr. Kirby, both interested in and also representing that company, and that the $1,130.55 tendered to Hull was furnished Pitrat by that company, which then had an agreeement in writing with Pitrat for the purchase of the patents.

To make the statement of the case complete, it is now necessary to refer to certain other contracts made by Pitrat prior to October 2, 1889. The first was dated June 1, 1889, and was with Ward and Wilson, for the sale of these same patents. It provided for a consideration of $1,000 to be paid within 30 days. That money was paid. It further provided that Pitrat should transfer the full and complete ownership of the patents by deed to Blackaller, as trustee, and that upon the performance of the conditions by Ward and Wilson, Blackaller should assign them to John T. Mulheron, Hull, Ward, and Wilson.

The contract further provided that if Ward and Wilson (who represented themselves and Hull and Mulheron) should fail to perform the agreement, the $1,000 should belong wholly to Pitrat.

On the 24th of October, 1888, a new agreement was entered into by Pitrat with the Detroit Computing Scale Company. It recited the execution of the agreement of June 1, 1888, and that, on June 29, 1888, Pitrat had executed a deed of trust for the patents to Blackaller, he to

convey, if the contract was complied with, to Mulheron, Hull, Ward, and Wilson, who subsequently associated themselves together and formed an incorporated company under the name of the "Detroit Computing Scale Company," and transferred to said company their rights in the patents; wherefore it was agreed that the scale company should buy and Pitrat should sell all his right, title, and interest in the patents, subject to the provisions of the contract of June 1, 1888, with Ward and Wilson, excepting that the time for payment and performance on the part of the scale company was extended for six months from December 1, 1888, and it was agreed that Blackaller should convey to the scale company instead of to the parties named in the first agreement. The time for the expiration of this contract was fixed at June 1, 1889. It was signed by Pitrat and by the scale company, per Hull, vice-president and general manager.

On May 11, 1889, an agreement was entered into between Pitrat and the Detroit Computing Scale Company that Hull should within 10 days convey to Blackaller in trust the Arkansas land, and that Pitrat would then extend the time for payment and performance of the contract by the scale company to October 1, 1889. This contract, which was signed by Pitrat and by Hull, further provided that if the scale company should then be in default, Blackaller should convey the Arkansas lands to Pitrat, and the same should be his sole property.

On the 17th of May, 1889, Pitrat, without any consideration, agreed with Hull that in the event of the failure of the scale company to carry out its agreement on or before October 1, 1889, Hull, for himself, should have 10 days within which to carry it out for his own benefit, subject to the conditions and stipulations binding upon the scale company.

The conditions of the contract with the scale company were not performed by that company, and on the 2d of October, 1889, Hull made the contract upon which this suit is based.

The next failure alleged against Hull is that he did not pay the $1,500 in cash, the receipt of which is acknowledged in the contract of October 2d. Hull testifies that the $1,000 which he had paid on account of the previous contract was included in and by consent made part of the $1,500. He is undoubtedly right in this claim. That there is no consideration for his agreement with Pitrat of May 19th is of no consequence. He had individually paid the $1,000. That contract was effective as a waiver of the forfeitures under the previous contract, and the rights of the parties now rest upon the contract of October 2, 1889, which was upon a new and different consideration. The previous contracts called for the conveyance of 150 Jerome Park lots. The contract of October 2d called for the conveyance of 200 Jerome Park lots. The acknowledgment in the contract of October 2, 1889, of the receipt of $1,500 by Pitrat, over his own signature, is so strongly corroborated as to settle it, in my opinion, that Hull's account of the transaction is correct.

The objection that Hull did not remove the mortgage incumbrance upon the Jerome Park lots has already been disposed of.

It is also objected that he did not convey the Arkansas property as he

agreed to do. This objection is not tenable. That property was to be conveyed to a trustee. Hull nominated a trustee, Albert F. Moore, of Gallipolis, who had been suggested by Pitrat. Hull's son saw Moore, who signified his willingness to accept the trust, and Pitrat was so notified. It appears from Pitrat's own testimony that he obtained from Blackaller a reconveyance of the patents about December 16, 1889. There seems to have been no good reason why he did not at the same time obtain the reconveyance of the Arkansas lands. He did in fact obtain that reconveyance later, but·did not offer to convey to Hull, nor to Moore, as trustee; neither did he transfer the patents to Moore in trust. Pitrat's agreement to so transfer the patents in order that they might be transferred to Hull was concurrent with Hull's agreement to convey the Arkansas land to the same trustee, and so long as he was in default in respect to the transfer·of the patents, and did not offer to make that transfer, he had no right to complain of Hull's failure to convey the land. More especially had he no such right when in fact, before he undertook to rescind, Blackaller had conveyed the land to him, and he himself held the title.

Right here it may be remarked that equity, under the provision of the contract requiring Pitrat to transfer the patents to a trustee, as above, would regard Pitrat,·upon his failure to make that transfer, as himself holding the patents in trust for the benefit of Hull, subject to the provisions of the contract. This consideration alone would be ample to maintain the equitable jurisdiction of this court to enforce the contract.

There is another item of testimony bearing upon the question of the right of Pitrat to rescind that must not be lost sight of, for it condemns him out of his own mouth. In his deposition given on the 29th of January, 1890, in the case of *Ward* v. *Detroit Computing Scale Company et al.*, he testified that Hull owed him upon this very contract the sum of $7,900, thereby recognizing it as in full force and effect long after the alleged default for which he subsequently claimed to rescind it. As to the effect of this testimony in that suit, see *Clough* v. *Railway Co.*, L. R. 7 Exch. 26, and *Gray* v. *Fowler*, L. R. 8 Exch. 249, 280.

There is no case here for rescission. The contract contains no provision for rescission. No fraud is shown. Hull was not in default. If he had been, Pitrat would have had no right to complain, for the reason that he was at least equally in default, and that after he was fully aware of Hull's default he affirmed the contract by his testimony in a suit relating to these same patents, to which Hull was a party.

It is not denied that on the 10th of April, 1890, Hull tendered to Pitrat full performance of all the terms of the contract. That the defendant the Dayton Autographic Register Company became a purchaser with full notice of Hull's equities is an admitted fact. Indeed, it may be fairly concluded from the testimony that Pitrat's desire to rescind his contract with Hull, and the steps taken to accomplish that end, were suggested and stimulated by that company and its agents in their eagerness to secure the patents. The objection that Hull had no title to the Jerome Park lots is not, in my opinion, sustained. I am clearly of the

opinion that the equity of this case is altogether with the complainant, and the decree will be in his favor, according to the prayer of the bill, with costs.