## TENNESSEE COPPER & CHEMICAL COR- PORATION v. MARTIN.

### No. 4087.

District Court, D. New Jersey.
July 25, 1932.

Wall, Haight, Carey & Hartpence, of Jersey City, N. J., for plaintiff.

H. C. Bierman, of New York City, for defendant.

AVIS, District Judge.

The bill in this case prays for the assignment and transfer of the right, title, and interest of defendant in certain inventions of defendant, which, it is alleged, belong to the plaintiff, because of a certain claimed contract of employment between the parties, plaintiff and defendant. Plaintiff alleges and claims it has proven that the defendant, a consulting engineer with inventive ability, was employed by it in research work to recover phosphate rock from other mineral with which it commingled, so as to make such recovery profitable, and to avoid the processes then in use by other parties, upon which patents had been issued, which patent processes could not be used by the plaintiff without infringement.

The question involved is one of contract. The plaintiff claims rights to all discoveries and inventions of the defendant, while he was in the employ of the plaintiff, under what is termed by plaintiff as an express contract, and under which the result of the work of the defendant was to belong to his employer, the plaintiff in this suit. The plaintiff secondly claims that, if there was not an express contract, the evidence shows that the defendant was employed by the plaintiff to develop a process and machinery which would accomplish the purpose desired, and that the result of such investigation vests in the plaintiff, the employer, the title to the patents issued, or to be issued thereon, under the doctrine established in the case of Standard Parts Company v. Peck, 264 U. S. 52, 56, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

Considerable time was taken at the trial in developing the facts with relation to the various processes in use for separating phosphate rock, but, as I view the case, it is not necessary for me to discuss any of these processes, as the question involved is whether an express contract was made, entitling the plaintiff to the result of work of the defendant, or, in the alternative, whether the employment was of such a nature, regardless of any express contract to that effect, to vest plaintiff with title to the processes of invention.

Defendant claims that the minds of the parties never met; that no express contract was ever made by which the plaintiff was to have the benefit of defendant's investigations; that the employment by the plaintiff of the defendant did not constitute the position of employer and employee, but that the defendant was an independent consulting

chemist, and, although paid by the plaintiff for making certain investigations, the result was for the benefit of the defendant, and that the plaintiff could have no greater interest than shop rights in the invention developed; that the invention was conceived by defendant and developed long prior to his employment by the plaintiff, and by reason thereof plaintiff is not entitled to patents to be issued; and that, as regards the cross-wire invention, it was developed while the defendant was employed by the U. S. Phosphoric Products Corporation, a separate company, upon a distinct and separate agreement, and that consequently the plaintiff can claim no rights in this invention.

The inventions involved, coming out of the original investigation, are represented by two patent applications, prepared by John F. Neary, patent attorney for the plaintiff, resulting from conferences with, and information from, the defendant, which have been filed in the Patent Office, and have, respectively, serial numbers 394739 and 394740, and the cross-wire invention was submitted to Mr. Neary, but before completion of the application the defendant revoked the power of attorney. The evidence shows, however, that subsequently an application embodying this cross-wire invention was filed in the Patent Office.

██ The plaintiff's claim of express contract is based upon sundry telegrams and letters, offered in evidence, and the testimony of witnesses as to verbal conversations with the defendant.

As hereinbefore stated, Mr. Martin was a consulting engineer, and it appears, as such, he was at times engaged, prior to the negotiations leading up to his alleged employment by the plaintiff, in research work on the method of recovery of minerals from crude ores containing gangue.

Mr. Neary represented the plaintiff and conducted the negotiations with Mr. Martin.

Without referring specifically to any of the evidence pertaining to his authority, I am satisfied that within the scope of the matters entrusted to him any contracts or agreements made by him with Mr. Martin were valid and binding upon the plaintiff.

Some time in the fall of 1928, Mr. Martin had requested Mr. Neary to obtain for Martin some phosphate rock that could be used in experiments he was then conducting. This was forwarded, and Neary, on December 17, 1928, wrote to Martin, requesting informa-

tion as to the result of Martin's experiments. On December 21, 1928, Martin answered this letter, requesting other ores.

Subsequently, and after consultation between Mr. Neary and his clients, the negotiation between the parties was initiated by a telegram, from Neary to the defendant, who was then in Florida, which read as follows:

"Western Union

"Day Letter               January 25, 1929
"R. B. Martin, General Delivery, Welaka, Florida

"Have you become involved with Bierman or the Cyanamid Company or any other interest in your flotation work? Stop If not, are you willing to undertake some research work on phosphate rock for my client on a per diem basis, the result of the work to belong to the employer. Stop If so, what would you charge per diem? Stop If terms can be agreed upon they want you to start work while in Florida.

"John F. Neary"

Subsequent to this telegram, correspondence was had between the parties by telegraph and mail, copies thereof being here inserted:

"Western Union

"1929 Jan 27 PM 6 12
"JHA 196 73 NL—PALATKA FLO 27
"John F. Neary—

"43 Exchange Place New York NY—
"Thank you for your wire  Have no arrangement with Cyanamid Company or Bierman  Stop  Hesitate at this time to undertake research on per diem basis as magnitude of their problem unknown quantity and solution of it might involve much time for this reason would prefer to examine conditions before undertaking work and suggest you arrange for me to make such examination while in Florida and I will report to you with my recommendations.

"R. B. Martin"

"R. B. Martin
"520 Pine Street
"Roselle, New Jersey
                "Welaka, Florida
                "January 27, 1929
"Mr. John F. Neary, 43 Exchange Place, New York City.

"Dear Mr. Neary: I am enclosing a confirmation of the night letter I am sending you today.

"You will readily appreciate my difficulty in fixing some equitable per diem fee without a knowledge of their conditions. I am will-

ing to undertake an examination on any basis you might arrange.

"With kindest regards, I am
"Sincerely yours,
"RBM—M                    R. B. Martin"

"Western Union·

"Night Letter            January 29, 1929
"R. B. Martin, Palatka, Florida

"Your wire twenty-seventh. Believe no difficulty will arise out of magnitude of problem or time for working. Stop We can arrange to fit it in with other requirements. Stop Suggest you meet Mr. Case of Phosphoric Company at Tampa about February eleventh. He will be at Tampa for about a month after that time. Stop Write me at once your itinerary so I can arrange with Case for time of meeting at Tampa. Stop Acknowledge receipt by wire.

"John F. Neary"

"R. B. Martin
"520 Pine Street
"Roselle, New Jersey
            "Welaka, Florida
            "January 30, 1929.
"Mr. John F. Neary, 43 Exchange Place, New York City.

"Dear Mr. Neary: I received your wire today, and have acknowledged its receipt by wire.

"I will be glad to meet Mr. Case at any time.

"My present plans call for being in Miami on Monday, February 4th, and in Tampa about the 7th or 8th. Telegrams could be sent in care of Western Union, to be called for.

"I am sending you a crate of oranges from down here. I found them to be very fine. I hope they reach you in good order.

"With kindest regards, I am
"Sincerely yours,
"RBM—M                    R. B. Martin"

"February 7, 1929
"Mr. R. B. Martin C/o General Delivery Tampa, Florida.

"Dear Mr. Martin: I am enclosing a copy of a wire that I am sending you today. Will you be good enough to get in touch with Mr. Case as soon after his arrival in Tampa as possible and go over the ground with him?

"What he is desirous of having you do is to study their raw material and the contemplated products, and then to see if you can develop, by research, an agent that will get away from the Minerals Separation patents. These patents cover the use of fatty acids and a soap, together with sodium silicate. This combination is probably patentable. What you will have to do is to avoid the use of fatty acids and the soaps, or either of them, although you need not avoid the use of sodium silicate in combination with some substance other than a fatty acid and a soap.

"I would suggest that after you have made such study of the problem as you can in Tampa, that you either there or here carry on such experiments as occur to you in a preliminary way. Before you go too far with your work, I think you ought to consult with me, if I am here (if not, with Mr. Yerxa and possibly with Dr. Pond) for the purpose of determining whether or not the agent that you have in contemplation is outside of the Minerals Separation patents. For your information, I am sending you copies of two patents belonging to Minerals Separation, namely, No. 1,492,904, to Sulman and Edser, and No. 1,547,732, to Broadbridge and Edser, and also a patent to Whitaker, No. 1,457,680. There may be other patents that we would need to consider in this connection, but for the present I think these patents will give you the field within which you must not venture, if you are to produce anything useful to the U. S. Phosphoric Products Company.

"I would suggest that you keep in close touch with my office and with Dr. Pond in the work that you do, so that we may be sure that no time will be spent upon reagents that are covered by the Minerals Separation patents. We ought to all be in agreement upon this subject before any extended work is done with any particular reagent.

"I am sending a copy of my telegram and of this letter to Mr. Case, for his information.

"Very truly yours,
"J.F.N./O              John F. Neary"

"Western Union

"Night Letter            February 7, 1929
"R. B. Martin, C/o Western Union Tampa, Florida
"(To be called for).

"A. H. Case will be in Tampa about February eleventh. Can be reached at Palace of Florence Apartments, Davis Island, Tampa, Telephone Number H one two nine five Tampa. Stop Suggest you leave question of compensation for me to arrange. Am writing you today to Tampa General Delivery.

"John F. Neary"

"R. B. Martin
"520 Pine Street
"Roselle, New Jersey
"St. Petersburg Fla.
"February 14, 1929.

"Mr. John F. Neary, 43 Exchange Place, New York City.

"Dear Mr. Neary: I acknowledge the receipt of your telegrams and letter of February 7th. with enclosures, for which I beg to thank you.

"I telephoned Mr. Case on Monday, and made an appointment to see him yesterday, Wednesday. We had a short general talk, and as he is slightly indisposed, put off our visit to the works until Monday next.

"After our inspection, I will be able to report at more length.

"Sincerely yours,
"RBM—M                    R. B. Martin"

"Western Union

"1929 Feb 16 AM 11 47
"MP56 39 DL Tampa Flo 16 1109A
"A. H. Case Palace of Florence Apts., Davis Island

"Unable to reach you by telephone this morning Stop Am leaving St. Petersburg and stopping at Babson Park for next few days telephone eight seven eight R please advise me where to meet you on Monday morning and at what time
"R. B. Martin"

"R. B. Martin
"520 Pine Street
"Roselle, New Jersey
"Babson Park, Fla.,
"February 19, 1929

"Mr. John F. Neary 43 Exchange Place, New York City.

"Dear Mr. Neary: I met Mr. Case in Bartow on Monday morning, and he took me to the pit and washery of the Phosphate Mining Co., near Mulberry. He is arranging to send to me at Roselle such samples of phosphate as I will need in my preliminary work.

"I am leaving here on Friday of this week, to be in Washington by March first. In care of Mr. Semmes' office will be my next address.

"Sincerely yours,
"RBM—M                    R. B. Martin"

I believe the evidence sustains my conclusions of fact that subsequently, some time in March or April of 1929, Mr. Martin went to Mr. Neary's office in New York, and there discussed the terms of the agreement as to Martin's compensation and it was then agreed that Martin was to receive $50 per day for his time spent in research and experimental work, and, if the research resulted in an invention of a process, patentable, and which would accomplish the purpose desired, a total compensation of not less than $5,000 and not to exceed $10,000; the exact amount within these limits to be determined by the employer, depending upon the value of the result.

Considering the telegrams and letters, and this verbal agreement, I am convinced that there was a complete coming together of the minds of the parties, constituting an express contract, which included the understanding that the result of the work was to belong to the employer, the plaintiff in this suit. No other conclusion can be fairly reached in view of all of the circumstances. The defendant readily accepted the employment; took no exception to the statements in the original telegram; continued his research work; consulted with Mr. Neary as to the results; forwarded to Mr. Neary the facts upon which applications for patents could be prepared; presented his bills for services rendered on the per diem basis; signed receipts indicating the employment, and certifying in the last receipt that this work was not then completed; and accepted checks or drafts in payment of his fees in accordance with contract made as claimed by the plaintiff.

Although the defendant, on the stand, denied the making of the contract, his actions can only be construed to indicate that, at the time he was rendering services, he was gratified to have the opportunity of earning the moneys which the plaintiff had agreed to pay. Subsequently, when it appeared that the invention might be valuable, his evidence indicates that he was desirous of retaining the discoveries for his personal benefit.

Although it appears not to be necessary to discuss the other legal principles advanced by the plaintiff, surely the evidence justifies the conclusion that the defendant was an employee of the plaintiff, and was employed to make researches and experiments to devise a new method of separation of phosphate rock. Whether or not the result worked out, as originally contemplated, or resulted in the origination of a new method, these discoveries were made in the course of employment, and became the property of the plaintiff.

The foregoing applies to the inventions covered by the two original applications for patents, but the invention of the cross-wire apparatus presents a somewhat different issue. It is true that the trip made to Florida by Mr. Martin in the winter and spring of 1930 was for the purpose of testing out, in a commercial way, the apparatus which had been devised, and that prior to going to Florida Mr. Martin had frequently been in contact with Mr. Neary, inquiring as to the time when this "pilot plant" would be ready to operate, and that it might be considered to have been under the original contract. However, the actual arrangements to go to Florida, and the fixing of compensation, appear to have been made in a letter by Mr. Martin to Mr. Case, and this, together with the latter's reply by telegram and letter, is inserted:

"520 Pine Street
"Roselle, New Jersey
"January 3, 1930

"Mr. A. H. Case, C/o U. S. Phosphoric Products Corporation 61 Broadway New York, N. Y.

"Dear Mr. Case: Mr. Neary has informed me that you would like to have me go to Tampa on a salary basis, rather than at my per diem of $50. I will superintend the experimental work and operation of the pilot plant at $700 per month and pay my own living and traveling expenses. It is my belief that not over three months will be required. It is my understanding that I will not be required to do work other than that connected with the phosphate concentration tests and that during temporary cessation in the work caused by breakdowns or by waiting for supplies I will not be required to remain at Tampa.

"If this arrangements meets with your approval, I am prepared to leave for Tampa within one week after hearing from you.

"Very truly yours,
"R.B.M./S.          R. B. Martin"

"Telegraphed Mr. Martin to come on these terms.
                              "A. H. C."

"Western Union
                    "January 8, 1930
"N309 16 NM—Tampa, Flo 8
"R. B. Martin 520 Pine Street Rosele, N. J.

"Referring your letter of January third terms proposed by you entirely satisfactory. Please report soon as possible.
"U. S. Phosphoric Products Corpn.
                              "A. H. Case"

"R. B. Martin
"520 Pine Street
"Roselle, New Jersey
                    "Washington, D. C.
                    "January 13, 1930
"Mr. A. H. Case, U. S. Phosphoric Products Corporation, Tampa, Florida.

"Dear Mr. Case. Responding to your telegram of January 8th, I have wired you as follows:

"'Enroute Tampa. Expect to arrive early part of next week.'

"Very truly yours,
"RBM—M          [Signed]     R. B. Martin"

The work in Florida was in continuance of the original contract, but, according to the contract made, did not contemplate more than the demonstration of what had already been invented. I am inclined to believe that it was not intended that further research or experiments should be made. The invention of the cross-wire attachment occurred during this demonstration, and while defendant was employed by the plaintiff for the purpose of developing a complete and efficient apparatus. Even though there was no express agreement at that time, the invention so devised is the property of the plaintiff company under the doctrine expressed in Standard Parts Company v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, supra.

There can be no question, under the evidence, but that Martin at the time he rendered these services in Florida in 1930 was actually the employee of the plaintiff.

I find as facts, as applied to the original agreement:

(1) That a valid contract was entered into between the plaintiff and the defendant for the services of defendant, in research and experiment for the accomplishment of a specific purpose, and that the results were to vest in the plaintiff.

(2) That, in any event, the defendant was an employee of the plaintiff, to make research and conduct experiments to accomplish a specific purpose, in the nature of the segregation of phosphate rock from gangue.

(3) That in this transaction the defendant was an employee of the plaintiff, and not an independent contractor or operator.

(4) That any conception of the process which may have occurred to the defendant prior to making the contract was not of a complete nature, never put in practice, and was developed to a workable point only after

the defendant became an employee of the plaintiff.

As to the cross-wire invention:

(5) That the defendant's operations in Florida in 1930 were as an employee of the plaintiff.

(6) That, although the invention at this time was not accomplished directly under the original contract, the defendant was there to test out the other apparatus, and any new device created to accomplish the original purpose was created while in employment of plaintiff for that specific purpose.

As applicable matters of law, I find:

■ (1) The defendant, having entered into an agreement with the plaintiff under which the defendant conducted research work and created inventions, and the agreement providing that the result of the work was to belong to the employer, the plaintiff is entitled to have the two original applications for patents, filed as aforesaid, assigned to it. Hull v. Pitrat (C. C. S. D. Ohio W. D.) 45 F. 94. Appeal in Supreme Court dismissed by stipulation of counsel, see 145 U. S. 650, 12 S. Ct. 986, 36 L. Ed. 847; Conway v. White (C. C. A. 2) 292 F. 837; Conway v. White (C. C. A. 2) 9 F.(2d) 863; Triumph Electric Co. v. Thullen (C. C. A. 3) 235 F. 74, 75. See, also, 36 Cyc. 558. Wege v. Safe-Cabinet Co. (C. C. A. 6) 249 F. 696; No-Leak-O Piston Ring Co. v. Chandlee, 53 App. D. C. 128, 289 F. 526.

■ (2) The defendant engaged for the specific purpose of making research and investigation to develop a phosphate rock separating process, as an employee of the plaintiff, if without a specific agreement as to the plaintiff being entitled to the result of the employment, his inventions would nevertheless vest in the plaintiff, who, under these circumstances, is entitled to have an assignment of the inventions evolved during such employment. Standard Parts Company v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, supra; Goodyear Tire & Rubber Co. v. Miller (C. C. A. 9) 22 F. (2d) 353.

■ The full consideration for the assignment has not yet been paid. What balance is due the defendant cannot be ascertained from the record. No tender has been made by the plaintiff, and such tender, before suit, was not required under the circumstances of this case, where the defendant, before issuance of the patent, revoked the power of attorney of Mr. Neary and denied the rights claimed by the plaintiff. However, some ad-

justment of this should be made before the assignment is completed, which may be taken up at the time the decree is signed.

Decree for specific performance will be entered in accordance with this memorandum.