## TEXAS CO. v. GULF REFINING CO.

(District Court S. D. Texas, at Houston. July 21, 1926.)

Equity No. 253.

**1. Patents ⬤═286—Equitable title to patent will support suit for infringement against the holder of the legal title.**

A bill alleging that a patentee was employed by complainant for the specific purpose of solving a particular problem in the course of which employment he solved it by the invention patented, shows an equitable title to the patent in complainant, upon which it may maintain a suit for its infringement in a federal court against the holder of the legal title.

**2. Estoppel ⬤═68(1)—Persistent denial, through years of litigation, that employé made invention patented, held to estop employer to claim equitable title to patent.**

An employer, after years of litigation, in which it persistently denied that an employé made the invention which he patented, and after it is finally defeated, will not be permitted to construct out of the facts an implied agreement that the employé would invent and that the invention should be the employer's.

**3. Master and servant ⬤═62—Invention made by employé under general employment is his own property.**

Where an employé, under a general employment, in the course of such employment was set to work on a specific problem, a resulting invention made by him does not belong to the employer but is his own property.

In Equity. Suit by the Texas Company against the Gulf Refining Company. Decree for defendant.

See, also, 12 F.(2d) 317.

C. R. Wharton, J. A. McNair, and Brady Cole, all of Houston, Tex., for Texas Co.

Melville Church, of Washington, D. C., and John E. Green, Jr., and D. Edward Greer, both of Houston, Tex., for defendant.

HUTCHESON, District Judge. Plaintiff brought this bill, alleging:

Infringement by the Gulf Refining Company of patents No. 1193540 and No. 1193541 relating to the conversion of higher boiling petroleum hydrocarbons into lower boiling petroleum hydrocarbons, granted to George William Gray on August 8, 1916, and for the infringement of letters patent No. 1424574 relating to the conversion of oils granted to defendant, Gulf Refining Company, on August 1, 1922, as assignee of Almer McDuffie McAfee.

That plaintiff is the legal and equitable owner of the Gray patents by assignment from Gray dated October 13, 1916, and the equitable owner of the McAfee patent, "if in fact McAfee is the true inventor," the McAfee invention having been made by McAfee while he was employed by the Texas Company for the particular purpose of solving the given problem upon the solution of which said patent was granted and is based.

That on and prior to June, 1911, plaintiff had in its employ one George W. Gray, a thoroughly skilled and experienced chemist thoroughly versed in the art of oil refining, including the manufacture of gasoline, who for years had been chairman of the refining committee of the Texas Company, which committee had direct supervision of the chemical research department and laboratory, and employed such chemists, helpers, and assistants as he deemed necessary to carry on the work to be done in his department.

That prior to 1912 McAfee was employed by the Texas Company as a skilled chemist in its testing laboratory at Bayonne, N. J. That during that time he applied to Gray for employment in the research department at Port Arthur, and that plaintiff agreed that McAfee should be transferred and employed at Port Arthur. That he left New Jersey and came to Houston, and in a conference with Gray the details of his employment were discussed, and he was sent to Port Arthur to begin work.

On the day following this conference, for the purpose of evidencing this employment, there was written by Gray to McAfee a letter under date of October 29, 1912, as follows:

"You will remember when you were in the office yesterday we were talking about the production of gasoline both from fuel oil and other distillates by cracking. We spoke of results that were being obtained from the use of nickel in the catalizing of liquid fatty oils into solid fatty oils.

"I wish you would carry out some experiments in an endeavor to convert the higher boiling fractions of petroleum into low boiling fractions, catalizing same in order to make them sweet and obtain a large yield of same.

"You know the results obtained by the distillation of heavy oils with aluminum chloride, how sweet naptha products are obtained by this process, and from your conversation with Mr. Mercereaux what results he claims for the nickel process. You told me that you had already gone through the literature on this subject, and as you are evidently posted on all this information, you can go ahead and probably accomplish something.

"I wish you would keep at this problem

and allow nothing to interfere with the same in trying to develop methods for the manufacture of naptha products from heavy petroleum products. I wish you to feel free to write me just what you are doing, so that I may keep posted on the same and offer any suggestions which may occur to me.

"We do not desire you to talk about the work you are doing to any one, as this work is strictly confidential.

"Mr. Van Gunday has been instructed to supply you with any apparatus or chemicals which you may need in carrying out your experiments."

To which letter McAfee made reply under date of November 1, 1912, as follows:

"Referring to yours of October 29 to me, I am glad of the opportunity of looking into the line we talked about in your office on Monday. From what I have been able to find out from conversations and literature, I feel satisfied that good will come from work of this character if thought and enough time is put on it, and under Mr. Holmes' and your direction I hope to be able to tackle this problem from every rational angle if so much is necessary to prove or disprove the practicableness of the idea.

"I have placed requisition with Mr. Van Gunday for a small amount of the material we shall need for beginning the work. If we shall want a larger quantity of hydrogen, it will be a simple matter I presume, to make it on the ground. I have ordered three or four different contact materials with the idea that we shall be able to select the one that does the work most economically and efficiently.

"As you suggest, the idea is to combine the contact process with the advantages of cracking process, and for this purpose we shall need a still of sufficient capacity to insure fairly good cracking and one able to stand at least 100 pounds of pressure.

"As regards the form of the still, I am inclosing herewith the patent of David T. Day, to which I referred in our conversation. On the first page you will note a diagram of the particular form of still which he has patented. In the contact process it seems to me essential that the reaction shall be allowed to take place immediately on cracking, and, whatever form our apparatus takes, this idea should be borne in mind.

"I found a lot of patent literature on the hydrogenating of fatty oils by the contact process for the preparation of edible fats, but this paper by Dr. Day is the only one worth while that I found regarding the same process as related to petroleum. You will note

that he claims in this paper to increase the yield of low boiling products, and before I saw this paper I had it from more than one source that the Standard Oil Company was employing a process other than cracking for the production of gasoline. Whether or no we are on the right track remains to be seen, but it seems clear to me that, if the low boiling cracked product can be saturated economically with the resulting sweetening and easiness of treatment, the experiment is probably worth while.

"As you know, there is considerable work being done on the chlorination of hydrocarbons. I merely bring this up now to point out that, if we wish to do any work with chlorine, this same still could be used.

"While the material is coming, Mr. Van Gunday has been good enough to put me on the stills in the experimental house, and as soon as he finishes with the 60-gallon coke still I would like to make a run on some oil which you may suggest in order to make fractions by cracking for comparative purposes.

"I await with interest your criticisms and suggestions."

That these letters constitute a contract of employment, and that it was a written contract, but that, if it was not a written contract, then the contract of employment was verbal, and the import of it was as shown by the letters. That implied as a part of said written or verbal contract was the agreement by McAfee that the results of his work, including any invention made by him, should belong to and be the property of Texas Company, and that any patent obtained by McAfee on such invention should be assigned by him to the Texas Company.

It further alleges that the said McAfee was solely employed by the Texas Company to solve a particular problem, generally known and referred to as the gasoline problem, and that he agreed to, was assigned to, and did devote his entire time after November, 1912, to research work to solve this problem, and that he did this work under the instructions of Gray and in association with him.

That, while this work was being done, a solution of the problem was discovered. That Gray, believing himself to be the inventor, filed application for the patents above referred to on January 23, 1913, and, the application being granted, assigned it to the Texas Company.

That McAfee, believing himself to be the inventor, on September 30, 1913, filed an application which showed the same invention as

the aforesaid Gray patent, and an interference was declared by the United States Patent Office on October 24, 1917.

That on March 6, 1922, the Court of Appeals of the District of Columbia affirmed the decision of the Commissioner of Patents in favor of McAfee, and thereafter the patent issued to the Gulf Refining Company as his assignee; McAfee having wrongfully assigned the said invention to the Gulf Refining Company.

That the Gulf Refining Company knew of all the facts and circumstances of the right of the Texas Company in said patent, because of the invention having been made as a result of McAfee's employment by that company. That it holds the legal title in trust for the Texas Company.

To this petition the defendant presented a motion to dismiss, among other grounds asserting:

(1) That it is not competent for plaintiff to bring a suit on patents in the alternative, but that it must allege positively and definitely which is the valid patent; and

(2) The suit was not one for infringement, since it was at best a suit to specifically enforce the contract claimed with McAfee.

This motion the court sustained in part and overruled in part, holding that, upon the allegations of the petition, plaintiff showed an equitable title to the patent within the decision of Peck v. Standard Parts Co., 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, but that it was not competent for plaintiff to allege on both patents in the alternative, and that, unless plaintiff elected on one or the other of the patents, the case would be dismissed.

Plaintiff amended, electing to stand upon the McAfee patent, and the cause proceeded.

At the trial of the case, the facts developed without dispute, and with one important and controlling difference, along the lines set out in plaintiff's petition. This difference is that, whereas the petition alleged that McAfee was solely employed to conduct a particular experiment, the facts are that he was merely generally employed, and in the course of his general employment as a chemist he was put for a time upon the specific work which resulted in the discovery. The controlling facts may be briefly stated as follows:

McAfee, a young chemist with an A. B. degree from the University of Texas, and a Ph. D. degree from Columbia University, was, on his graduation in 1911, employed by the Texas Company at a salary of $100 per month, and sent to Bayonne, N. J., where he did routine testing in the laboratory. In June, 1912, his salary was increased to $112.50 per month. He was dissatisfied with the character of his work at Bayonne, and was constantly trying to persuade the officers of the Texas Company to transfer him to Port Arthur, where he would have a broader field for learning petroleum manufacturing. His patience was finally rewarded, and the officers of the company consented that he go to Port Arthur. On his way he stopped at Houston, the main office of the Texas Company, and was referred by Mr. Holmes, his superior in the refining department, to Dr. Gray, the chief chemist of the company, with whom he talked a long time about the problem of cracking petroleum oil, and sweetening the cracked product by hydrogenation, using nickel as a catalyst.

He told Dr. Gray that "during the summer, until the time I started to Texas, I had been going through literature, and had had conversation with Mr. Mercereaux from which I thought he might be using nickel and hydrogen for the production of sweet gasoline from high boiling hydrocarbons."

He went to Port Arthur and for two days worked on analyzing some grease samples, and after that he went to work in accordance with the letters from Gray set out hereinabove.

For the work he was given special apparatus and devoted his entire time to this problem. He was advised that he should report directly to Dr. Gray, and injunctions were placed on him as to the necessity for secrecy. Finally at 8 o'clock on the morning of December 12, 1912, he made or, as he put it, "stumbled" on his invention, which, as he described it, is "simply distilling high boiling hydrocarbon and anhydrous aluminum chloride, and maintaining a temperature not exceeding 350 degrees Fahrenheit at that point where the vapors are allowed to enter the final condenser.

While he was on this special work, some question came up as to whether he was under Van Gunday, the chemist at Port Arthur, and Mr. Holmes for the Texas Company told Van Gunday that both Dengler and McAfee were in his organization, and that they could be called upon to assist him in other work, when it was necessary.

All of the witnesses testified that there was no discussion or suggestion at any time of an invention, no agreement as to invention, and neither the word nor the idea was ever discussed or considered by them.

After the discovery had been communicated to Dr. Gray, he applied for a patent as the inventor of the process, which, when McAfee learned, caused him great dissatisfaction and discontent, and he protested vigorously to Gray against his name not being included in the application.

Gray undertook to and as far as surface appearances went apparently mollified McAfee, but he evidently pondered all these things in his heart, and later, having taken the matter up with Holmes, and receiving no satisfaction, he, as the result of negotiations with the Gulf Refining Company entered their employ, advising them of his discovery which he had made, and the importance attached to it by the Texas Company. They obtained from him his rights to the invention, gave him a contract at a considerably increased salary, and assured him that they would give him the best of treatment and take full care of him in his future relations with the company, and in September, 1913, prepared an application for a patent in McAfee's name and from that time on pressed the application, conducted the interference proceedings, and all of the litigations which have grown out of this discovery.

After getting McAfee's rights, and putting him in charge of their operations along the line of the discovery, the Gulf Refining Company commenced to and did spend large sums of money at Port Arthur for the production of the aluminum chloride needed in the process and for the installation of stills and work houses required, and after 1922, when the patent was issued to them, and before this suit was filed, spent large sums of money.

After long, protracted, and costly litigation, the interference proceedings resulted as pleaded by plaintiff, and the patent immediately issued to the Gulf Refining Company.

Upon the issuance of the patent, the Texas Company filed suit under section 4918, R. S., to finally try out the question of priority between the patents, in the District Court for the Eastern District of Texas at Beaumont, but that suit, prior to judgment, was dismissed. Thereafter they filed suit in the district court of Harris county, alleging that they had a contract with McAfee to convey the patent to them, praying that he be compelled to do so.

Before this came to trial, the United States Supreme Court rendered its decision in Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, and plaintiffs, taking their cue from that decision, filed this bill, asserting an equitable title to the patent obtained by McAfee by reason of that decision, and claiming its infringement.

Defendant met plaintiff's claim, asserting:

(1) That plaintiff's suit, taken at its best, presents merely a suit for specific performance of an agreement to convey a patent, and therefore not an infringement suit, but a mere suit on contract, of which, the requisite diversity of citizenship being absent, this court has no jurisdiction.

(2) That the undisputed facts clearly show a case merely of a general employment, with a discovery incident to that employment, and not, as in the Peck Case, a specific employment to do a specified thing.

(3) That, if the circumstances of the employment do not of themselves prevent any inference of a specific agreement to invent for the benefit of the employer, the Texas Company's own construction of the matter for more than ten years, during which they not only did not claim such an agreement, but denied that McAfee had invented anything, determines conclusively against them the legal effect of those facts.

(4) That plaintiff, by its long and persistent course in asserting that not McAfee, but Gray made the invention both before the Patent Office and in its suit at Beaumont and in and out of court constantly since 1912, find themselves in the position of having made an election to stand upon a view so inconsistent with that which they now take that they cannot now affirm what they have heretofore constantly disaffirmed.

(5) That both the lapse of time and their conduct during that long lapse, together with the enormous expenses of the Gulf Company, in reliance upon their non-claim to the title of McAfee's invention, makes it inequitable now to permit them to maintain this suit, and so bars them through laches.

(6) That a true case of estoppel, not only by election, but in pais, arises through the constantly asserted position of the Texas Company that not McAfee but Gray invented the process, and their position that, even if McAfee did invent it, the Texas Company would have not a title, but a shop right. See letter of Lufkin written in 1922 to the Gulf Company.

(7) That the Gulf Refining Company is an innocent purchaser of the patent for value, without notice of plaintiff's claim of equitable title, since at no time until the filing of this suit in September, 1925, was there any

claim by the Texas Company that they owned any title in McAfee's patent, but, on the contrary, a clear statement by them that they had only a license right therein.   See letter of Lufkin, president of the Texas Company, to the Gulf Refining Company.

[1] Upon defendant's first contention it will be sufficient to say that I adhere to the views already announced, that this is an infringement suit of which this court has jurisdiction, for it is the facts as alleged in the petition, and not those proven which determine jurisdiction, and those facts alleged a specific employment solely for the solution of a specific problem, and would, if proven, constitute an equitable title to the patent.

[2] As to the other asserted defenses, since the facts relied upon by plaintiff as constituting an equitable title do not in fact, create one, I have concluded to rest my opinion upon that point, pretermitting the other questions raised, other than to say that I do not believe it would be in any wise equitable to now permit the Texas Company to reverse the position maintained by it throughout all these years, and even in this very suit as first filed, that Gray was the inventor, in order to construct out of the employment a title, even though, if the Texas Company had from the very beginning acclaimed McAfee as the inventor, and asserted their equitable title to the invention, I should believe the facts to be sufficient to support the claim.

In short, an executory agreement to do work which is relied upon as the source of an equitable title springing to the employer to an invention must be acted upon by both employer and employé in accordance with the claimed intent, in order to justify a court in implying that intent, and an employer should not be permitted to persistently deny, until finally defeated by his employé, that the employé ever made an invention, and then at long last seek to construct out of the facts an implied agreement that the employé would invent, and that the invention would be his employer's when produced.

[3] Turning then to the point on which the case goes off, the failure of plaintiff to prove facts establishing an equitable title in them to the invention, it must be conceded that prior to the decision of the Supreme Court in Standard Parts Co. v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033, a most confusing state of the law is presented, due not to the failure on the part of the United States Supreme Court to set down with clearness and precision the principles by which it could be determined that a title did or did not arise, but because no case until that one had ever been decided by the Supreme Court in which the facts had been held sufficient to create such a title, and the statement as to what facts would be sufficient had always been made in cases in which it had been held that such facts did not there appear, with the result that some of the courts and most of the bar construing these decisions had given effect to the announcement of the general principle laid down in the Solomon Case, and applied in Dalzell v. Dueber, 149 U. S. 315, 13 S. Ct. 886, 37 L. Ed. 749, Hapgood v. Hewitt, 119 U. S. 226, 7 S. Ct. 193, 30 L. Ed. 369, Gill v. United States, 160 U. S. 426, 16 S. Ct. 322, 40 L. Ed. 480, and McAleer v. United States, 150 U. S. 424, 14 S. Ct. 160, 37 L. Ed. 1130: "Nor does the mere fact that an inventor is at the time of his invention in the employ of the government transfer to it any title to, or interest in, it.   An employé, performing all the duties assigned to him in his department of service may exercise his inventive faculties in any direction he chooses, with the assurance that whatever invention he may thus conceive and perfect is his individual property.   There is no difference between the government and any other employer in this respect."   137 U. S. 346, 11 S. Ct. 89, 34 L. Ed. 667—while assigning the inconsequence of dicta to the concluding part of that paragraph: "But this general rule is subject to these limitations. If one is employed to devise or perfect an instrument, or a means for accomplishing a prescribed result, he cannot, after successfully accomplishing the work for which he was employed, plead title thereto as against his employer. That which he has been employed and paid to accomplish becomes, when accomplished, the property of his employer.   Whatever rights as an individual he may have had in and to his inventive powers, and that which they are able to accomplish, he has sold in advance to his employer."   Id.—because in those cases the employer was denied a title and awarded merely a license.

This confusion the Peck Case has clarified, not by departing in any manner from or limiting the general principle as announced and applied in Dalzell v. Dueber, 149 U. S. 315, 13 S. Ct. 886, 37 L. Ed. 749, "A manufacturing corporation, which has employed a skilled workman, for a stated compensation, to take charge of its works, and to devote his time and services to devising and making improvements in articles there manufactured, is not entitled to a conveyance of patents obtained for inventions made by him while so

employed, in the absence of express agreement to that effect," but by declaring that the exception to the general rule as laid down in Solomon's and following cases was equally the law. It did no more, however, than to establish the two propositions, the rule and the exception, as of equal weight.

It did not, as contended by the Texas Company here, extend that exception so as to make a new rule *"that the setting of a general employé to do a specific work would create a title in his invention in his employer."* It merely held that "the invention of a specific thing could be made the subject of a bargain, and pass in the execution of it," and it grounded its decision in favor of the employer upon a specific contract by which Peck engaged "to devote his time to the development of a process and machinery for which he was to receive a stated compensation," and it emphasized the effect of the specific contract for the creation of a specific thing, in these words:

"Whose property was the process and machinery to be when developed? The answer would seem to be inevitable and resistless to him who engaged the services and paid for them, they being his inducement and compensation."

On the pleadings the Texas Company brought themselves within this decision. They alleged a specific contract for the invention of a specific thing. On the facts they failed. They proved a general employment with an invention resulting from the setting of McAfee in the course of and as a part of that general employment upon a specific problem.

If the facts of this case should be held sufficient to give the Texas Company a title, the rule as laid down in Solomon, Dalzell, McAleer, Gill, and Peck Cases, that inventions made under a general employment belong to the employé, while those made under a special contract for a specific result belong to the employer, would have to be practically overthrown, by the addition of the following proviso: That any general employment can be converted into a special contract for invention so as to deprive an employé of his invention, merely through the device of causing the employé to be put upon special work under special directions from his superior— and, as I read the law, there is neither precedent nor reason for such addition.

Finding that the plaintiff has no title to the patent, the bill must be dismissed for want of equity.