STANDARD PARTS COMPANY *v.* PECK.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

No. 160.   Argued January 15, 1924.—Decided February 18, 1924.

One who is employed and paid by another to develop a process and machinery for manufacturing a specified product, and who patents an invention made by him in the course of the employment, holds the patent for his employer.   P. 58.

282 Fed. 443, reversed.

CERTIORARI to a decree of the Circuit Court of Appeals which reversed in part a decree of the District Court in a suit brought by Peck to enjoin the Standard Parts Company from infringing his patent and for an accounting, etc.   The District Court adjudged the equities in the company's favor and ordered Peck to assign to it the patent in question and any others, or applications therefor, based on inventions made by him in pursuance of his employment by the company's predecessor.   The Court of Appeals allowed the company only certain rights as licensee.

*Mr. Bert M. Kent* and *Mr. A. V. Cannon,* with whom *Mr. John M. Garfield* and *Mr. James P. Wood* were on the brief, for petitioner, cited and discussed the following cases:

*Solomons* v. *United States,* 137 U. S. 342; *McAleer* v. *United States,* 150 U. S. 424; *Gill* v. *United States,* 160 U. S. 426; *Bloxam* v. *Elsee,* 1 Carr. & Payne, 558; *McClurg* v. *Kingsland,* 1 How. 202; *Hapgood* v. *Hewitt,* 119 U. S. 226; *Dalzell* v. *Dueber Mfg. Co.,* 149 U. S. 315; *Air Reduction Co.* v. *Walker,* 195 N. Y. S. 120.

*Mr. George L. Wilkinson,* with whom *Mr. Charles L. Byron* was on the brief, for respondent.

Any right of action which petitioner may have must be based upon an implied contract growing out of the

employment of Peck by the Pontiac Company.   Whether or not a contract may be implied depends upon the intentions of the parties.

There was no intention on the part of either Peck or the Pontiac Company that Peck should assign any inventions or patents.   The parties did not have in contemplation the making of patentable inventions by Peck in performing the work for which he was employed.   Peck's uncontradicted testimony is that it was not until after the contract had been entered into that any . question arose as to the possibility of any patentable inventions being made by him in building the machines and ·in developing the processes, for which he was employed.

Specific performance will only be granted where it is clearly established by evidence that the party seeking it is entitled to it.   *Hennessy* v. *Woolworth,* 128 U. S. 438; *Colson* v. *Thompson,* 2 Wheat. 336; *Dalzell* v. *Dueber Mfg. Co.,* 149 U. S. 315.

A license under a patent will only be implied where the circumstances are such as to estop the patentee from denying the existence of such license.   *Edison Co.* v. *Peninsula,* 101 Fed. 831.   The same rule would seemingly equally apply to an implied agreement to assign a patent to an employer.

An employer is not entitled to a patent covering an invention made by an employee, in the absence of an express agreement to that effect, but only to a shopright, or nonexclusive, nontransferable license thereunder. *Hapgood* v. *Hewitt,* 119 U. S. 226; *Dalzell* v. *Dueber Mfg. Co.,* 149 U. S. 320; *Pressed Steel Car Co.* v. *Hansen,* 128 Fed. 445; *Morton* v. *Andrews Co.,* 229 Fed. 150; *Niagara Co.* v. *Hibbard,* 179 Fed. 845; *Burpee* v. *Guggenheim,* 226 Fed. 219; *Johnson Co.* v. *Western Co.,* 178 Fed. 823; *Hildreth* v. *Duff,* 139 Fed. 141; *Barber* v. *National Co.,* 129 Fed. 372.

*Solomons* v. *United States,* 137 U. S. 342, did not refer to *Hapgood* v. *Hewitt,* 119 U. S. 226, doubtless because

the title to the patent in suit was not at issue, but merely the right of the United States to a license thereunder. Subsequently, this Court, in *Dalzell* v. *Dueber Mfg. Co.*, 149 U. S. 315, a case in which was directly involved the title of an employer to a patent covering an invention made by an employee, followed *Hapgood* v. *Hewitt*, and held that the employer was not entitled to an assignment of the patent. *McAleer* v. *United States*, 150 U. S. 424, and *Gill* v. *United States*, 160 U. S. 426, were implied license cases.

No decision of a federal court has been found in which, in the absence of an express agreement, an employer has been held entitled to an assignment of a patent covering an invention made by an employee regardless of whether the employment was general, or for the special purpose of developing or devising certain specific machines, processes or improvements. *Barber* v. *National Co.*, 129 Fed. 370; *Pressed Steel Car Co.* v. *Hansen*, 137 Fed. 403; *Air Reduction Co.* v. *Walker*, 195 N. Y. S. 120.

The suit is barred by laches.

The consideration which Peck received under his contract was for the work which he did for his employer without regard as to whether or not he might make any patentable inventions. No consideration whatever has passed to him to support the assignment. *Dalzell* v. *Dueber Mfg. Co.*, 149 U. S. 315.

The shop-right of an employer is not transferable. *Hapgood* v. *Hewitt*, 119 U. S. 226; *Boston* v. *Allen*, 91 Fed. 248; *Barber* v. *National Co.*, 129 Fed. 370; *Gill* v. *United States*, 160 U. S. 426; *Pressed Steel Car Co.* v. *Hansen*, 137 Fed. 403; *Lane Co.* v. *Locke*, 150 U. S. 193; *Rowell* v. *Rowell*, 122 Wis. 21; *Bowers* v. *Lake Superior Co.*, 149 Fed. 983.

The procedure adopted by the Court of Appeals in this case would permit the piecemeal trial of cases in disregard of the evident intent of Equity Rule 30.

Mr. Justice McKenna delivered the opinion of the Court.

Suit for injunction, preliminary and perpetual, and accounting for profits and damages, upon the ground of infringement of Letters Patent No. 1,249,473, issued to William J. Peck, respondent.

The bill is the usual one in patent cases. For answer to it the Standard Parts Company admits the use of the devices of the patent and alleges they were constructed under the supervision of Peck and under the terms and provisions of a contract dated August 23, 1915, by and between him and the Hess-Pontiac Spring and Axle Company, for and in behalf of the latter company and the Western Spring and Axle Company, and that it, the Standard Company, has succeeded to the entire assets, business and good will of those other companies, including all of their rights in said contract and devices. And the Standard Company avers that Peck was fully compensated for his connection with the devices.

As an offset and counterclaim, the Standard Company avers that all of the invention in the letters patent was made while Peck was in the employ of its predecessors in business, the Axle Companies above mentioned, and that he was so employed for a period of approximately one year and eight months, and paid, while so employed, a salary of $300 per month, and, at the conclusion of the employment, paid a bonus of $660.

In answer to the counterclaim, Peck admits the contract but denies that it raised the contractual relations averred, or that it could be construed as passing any title to any inventions which might be incorporated in machinery built thereunder; and that neither the Axle Companies nor any person who might have purchased their assets, business and good will could have acquired any right, title or interest in the inventions.

Admits the period of employment averred and that he received the compensation averred, and that at the conclusion of his employment he received a bonus of $660, being the amount of $10 for each 10% of reduction of direct labor cost as called for in said contract, the figures compiled by the Hess Company showing a reduction of 66% in direct labor.

Admits that prior to and during the continuance and subsequent to the period of his employment he practiced as an attorney at law and solicitor of patents, but denies ever so acting for either the Hess Company or Western Company, and denies that he ever prepared or filed or executed any applications for either of the companies, or that any of such applications matured into the patent in suit.

He denies the other allegations of the counterclaim.

On the case as thus presented, Peck's testimony and some other testimony was taken, and certain exhibits introduced, and the judgment of the District Court was, after a review of the decisions of this and other courts, " that the property in the invention belonged to the employer" (the Hess-Pontiac Spring and Axle Company), and that this property passed to the Standard Parts Company when it acquired the assets of the Axle Company, and that Peck holds the legal title in trust for the Standard Company. A decree was directed to be entered requiring an assignment of the legal title to the latter Company.

A motion for rehearing was made and denied, and on March 2, 1921, a formal decree was entered, adjudging the equities to be in favor of the Standard Company, and that Peck, within ten days from the date of the decree, assign and transfer to the company the legal title to the letters patent, and also transfer to it all other patents or pending applications for patents for inventions made by him, in connection with the processes and machinery de-

veloped in the performance of the agreement with the Axle Company.

It was further adjudged that, if Peck failed to perform the decree, " then and in that event " the " decree shall have the same force and effect as such assignments and transfers would have had if made."

The Circuit Court of Appeals reversed the decree of the District Court in so far as it decreed an assignment and transfer of the patent in suit and other patents and applications from Peck to the Standard Company.

The court decreed a license to exist in the Standard Company in the machines, distinguishing, however, between the first six and the last four, in that, in the first six, title was in the Standard Company " wholly free from the monopoly of the patent," this being " within the spirit and fairly within the letter of Sec. 4899 ",[1] and that the Pontiac Company had a right to sell these six machines to the Standard Company free from the patent. As to the last four, it was decided, that the license to construct them was not assignable and could not pass to the Standard Company " by the ordinary purchase and sale of a business."

The court concluded its opinion as follows: " Defendant [Standard Company] may be advised that it can abandon any further claim of license as to these four machines and contest the patent on its merits—a matter about which we express no opinion—and otherwise it is clearly open to defendant to make what effort it can to establish a license on the theory of estoppel by reason of Peck's knowledge of

---

[1] " Every person who purchases of the inventor, or discoverer, or with his knowledge and consent constructs any newly invented or discovered machine, or other patentable article, prior to the application by the inventor or discoverer for a patent, or who sells or uses one so constructed, shall have the right to use, and vend to others to be used, the specific thing so made or purchased, without liability therefor."

the building of these four machines without objection—if such knowledge and conduct occurred—or on the theory of a practical consolidation of the Pontiac Company with the present defendant—if their relationship has that character. (*Lane* v. *Locke,* 150 U. S. 193).

" The decree below is reversed and the record remanded for further proceedings in accordance with this opinion."

The courts reached different rulings because of different readings of the cases. That of the District Court was, that while the mere fact that one is employed by another does not preclude him from making improvements in the machines with which he is connected, and obtaining patents therefor, as his individual property, yet, if he " be employed to invent or devise such improvements his patents therefor belong to his employer, since in making such improvements he is merely doing what he was hired to do."

The Circuit Court of Appeals rejected this test. It conceded, however, that the deduction of the District Court was sustained by *Solomons* v. *United States,* 137 U. S. 342; *McAleer* v. *United States,* 150 U. S. 424, and *Gill* v. *United States,* 160 U. S. 426, and if correct, required the affirmance of the decree of the District Court. And the court admitted that there was no later declaration than that of those cases, nor any criticism of it. The court, nevertheless, dissented from it, subordinating it to other cases and reasoning, they establishing, it was considered, " that an invention does not belong to the employer, merely by virtue of an employment contract, as well when that employment is to devise or improve a specific thing as when the employment is to devise improvements generally in the line of the employer's business." And considering further that Peck's employment was to devise or improve a specific thing, decided that his contract did not " of its own force, convey to the employer the equitable title to the patentable inventions " which he " might make in the course of its execution " but gave " to the employer a license only."

It is going very far to say that the declaration of *Solomons* v. *United States,* repeated in subsequent cases, and apparently constituting their grounds of decision, may be put aside or underrated—assigned the inconsequence of dicta. It might be said that there is persuasion in the repetition. It cannot be contended that the invention of a specific thing cannot be made the subject of a bargain and pass in execution of it. And such, we think, was the object and effect of Peck's contract with the Hess-Pontiac Spring and Axle Company. That company had a want in its business, a " problem ", is Peck's word, and he testified that " Mr. Hess thought probably " that he, Peck, " could be of some assistance to him [Hess] in working out " the " problem ", and the " thought " was natural. Hess had previous acquaintance with Peck—his inventive and other ability, and approached him, the result being the contract of August 23, 1915, the material parts of which are as follows: " This Agreement Witnesseth, that second party is to devote his time to the development of a process and machinery for the production of the front spring now used on the product of the Ford Motor Company. First party is to pay second party for such services the sum of $300 per month. That should said process and machinery be finished at or before the expiration of four months from August 11, 1915, second party is to receive a bonus of $100 per month. That when finished, second party is to receive a bonus of $10 for each per cent of reduction from present direct labor, as disclosed by the books of first party."

By the contract Peck engaged to " devote his time to the development of a process and machinery " and was to receive therefor a stated compensation. Whose property was the " process and machinery " to be when developed? The answer would seem to be inevitable and resistless—of him who engaged the services and paid for them, they being his inducement and compensation, they

being not for temporary use but perpetual use, a provision for a business, a facility in it and an asset of it, therefore, contributing to it whether retained or sold—the vendee (in this case the Standard Company) paying for it and getting the rights the vendor had (in this case, the Axle Company).

Other meaning to the contract would confuse the relation of the parties to it—take from the Axle Company the inducement the company had to make it—take from the company the advantage of its exclusive use and subject the company to the rivalry of competitors. And yet, such, we think, is the contention of Peck. He seems somewhat absorbing in his assertion of rights. He yields to the Axle Company a shop right only, free from the payment of royalty but personal and temporary—not one that could be assigned or transferred. Peck, therefore, virtually asserts, though stimulated to services by the Hess Company and paid for them—doing nothing more than he was engaged to do and paid for doing—that the product of the services was so entirely his property that he might give as great a right to any member of the mechanical world as to the one who engaged him and paid him—a right to be used in competition with the one who engaged him and paid him.

We cannot assent to this nor even to the limitation the Court of Appeals put upon Peck's contention. We concur with the District Court and therefore reverse the decree of the Circuit Court of Appeals.

*Reversed.*