## PALEY v. DU PONT RAYON CO.
### No. 5123.

Circuit Court of Appeals, Seventh Circuit.
June 23, 1934.

Albert F. Mecklenburger, of Chicago, Ill. (B. Gordon Aller, of Chicago, Ill., of counsel), for appellant.

Mitchell D. Follansbee, Clyde E. Shorey, and Robert W. Schupp, all of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge.

Appellant, a patent solicitor and draftsman by profession, entered the employ of appellee's predecessor, October 1, 1924, and voluntarily terminated such employment, March 31, 1926. The employment contract was in writing; the provisions thereof are set forth below.* During the period of his employment he made two discoveries, on both of

---

*"Whereas, the Employer is engaged in the manufacture or production of chemical compositions * * *

"Whereas, said Employer now maintains a bonus plan under and in accordance with which bonuses are awarded and granted to

which he applied for and secured a patent. The first patent he assigned to his employer. The second patent was issued October 21, 1930, upon an application filed December 17, 1926. This patent was the subject matter of the instant suit which terminated in a decree directing the assignment of said patent to appellee.

The patent in issue covers a method of and apparatus for treating artificial fibers. It relates "more specifically to a process of and an apparatus adapted for treating cakes of artificial fibers such as rayon, artificial wool, etc., with fluids and liquids such as water, air, and or desulphuring, bleaching and dyeing solutions."

The court found, upon evidence which amply supported the finding, that during appellant's employment he conceived of and reduced to practice the invention covered by this patent; that on December 17, 1926, he filed his application for a patent; the patent was issued to him October 21, 1930; that he did not secure the consent, oral or written, of his employer to file said application and his action in so doing was without the knowledge of his employer.

Appellant relies on three defenses: (a) Appellee cannot claim the patent by reason of the nature of appellant's employment but must rely upon the employment contract, which should not be enforced in the instant case because unduly harsh and inequitable and because mutuality thereunder is lacking. (b) Appellee waived its right to the patent by rejecting it and is now estopped to claim it. (c) Appellee was guilty of fraud in that it concealed the true conditions of its bonus plan, which was a material inducement for entering into the employment contract.

(a) It is immaterial in the case before us whether appellant's right to the assignment of the patent is traceable to a contract or to the nature of appellant's employment. Approached from either starting point, we arrive at the same conclusion.

Appellant's original answer was by him prepared and filed without the assistance of counsel. In the first amended answer it is stated that appellee's predecessor was desirous of securing the services of appellant "as an engineer in its experimental department for the purpose of studying and solving problems relating to the manufacture and produc-

employes who have contributed in an unusual degree to the success of the Employer by their inventions or for other conspicuous service; and the prospective benefits to be derived under such bonus plan are an incentive to all employes (whether directly or indirectly engaged in the manufacture or production aforesaid) to devote their energies as and when their duties will permit to the production of new inventions and the improvement and perfection of those already existing; and

"Whereas, said Employe desires to enter or continue in the employment * * * and to such extent as may be possible to co-operate in the improvement of the Company's 'inventions' and to participate in the benefits of said bonus plan under the conditions thereof;

"Now, Therefore, said Employer and said Employe * * * agrees each with the other, as follows:

"First: That the Employe will devote his entire time and his best efforts, during the period of his said employment, to such duties as may be assigned to him by said Employer, and that he will faithfully and diligently serve and endeavor to further the interests of said Employer during the period of his said employment.

"Second: That any and all improvements and inventions which said Employe may conceive or make, during the period of his said employment, relating or in any way appertaining to or connected with any of the matters which have been, are or may become the subject of said Employer's investigation, or in which said Employer has been or may become interested, shall be the sole and exclusive property of said Employer, and that he will, whenever requested so to do by said Employer, execute and assign any and all applications, assignments, and other instruments which said Employer shall deem necessary in order to apply for and obtain Letters Patent of the United States or foreign countries for said improvements or inventions and in order to assign and convey to said Employer the sole and exclusive right, title and interest in and to said improvements, inventions, applications and patents.

"Third: That said Employe shall not, directly or indirectly, disclose or use at any time, either during or subsequent to his said employment, any secret or any confidential information, knowledge or data of said Employer (whether or not obtained, acquired or developed by him), unless he shall first secure the written consent of the Employer to such disclosure or use.
* * *

"Fifth: That said Employe's obligation to execute the papers referred to in Paragraph Second shall continue beyond the termination of the period of employment with respect to any and all improvements or inventions conceived or made by him during the period of said employment.
* * * "

tion of rayon, *and also for the purpose of discovering, improving, and perfecting new inventions * * *.*" In the second amended answer there were omitted the words set forth in italics. The omission is rather significant. The court was under all the circumstances justified in finding what appellant formerly admitted to be the fact, viz., that the nature of his employment was such as to entitle appellee to the patents obtained upon discoveries by him made without any employment contract expressly providing for the assignment of patentable discoveries.

■ However, the contract which the parties signed, in view of the court's finding as to the date of appellant's discovery, covers the precise question we are now considering. It provided for the assignment of patents obtained upon discoveries made by appellant *during the period he was employed by appellee.* Such a contract is neither harsh, nor inequitable, nor unconscionable. Courts have uniformly held it to be the proper basis of a decree of specific performance such as was entered in this suit. Magnetic Manufacturing Company v. Dings Magnetic Separator Co. (C. C. A.) 16 F.(2d) 739; Standard Parts Company v. Peck, 264 U. S. 52, 44 S. Ct. 239, 68 L. Ed. 560, 32 A. L. R. 1033.

■ (b) Appellant's argument on waiver and estoppel is predicated on an erroneous fact assumption. He assumes that Evans, another of appellee's employees and appellant's superior, did in fact reject the discovery for which appellant subsequently obtained a patent and that in so doing Evans was authorized by appellee to pass upon and accept or reject patentable discoveries.

We fail to find anything in the record which would have justified the court in finding that Evans was the authorized representative of appellee to accept or reject patentable discoveries made by other employees. This is likewise the conclusion which Judge Lindley reached. In his memorandum disposing of the case ([D. C.] 4 F. Supp. 290, 293) he said:

"The court fails to find in the conduct of Evans, a subordinate officer with no final authority to pass upon the policy of the company with regard to inventions, anything which would create an estoppel against the company's claim of title to the patent."

He further says:

"* * * Defendant tendered to Evans, one of his superiors, but no one possessing final authority, his plan, drawings and report with regard to the subject matter of the invention. Evans received and studied the same and he made in writing certain notations concerning what he deemed impractical features and returned to defendant, his original drawings and Evans' criticisms. This was in October, 1925. Defendant says that about ten days later he again talked with Evans concerning this particular matter and that Evans persisted in his criticisms. No further talk occurred between the two."

The most that can be said about the communications, oral and written, between appellant and his immediate superior is that two employees working on a problem which possibly called forth patentable discoveries differed in opinion as to the practicability of appellant's apparatus. There is nothing in the correspondence or the report that bore even remotely upon the subject of patentable inventions or of patents obtainable thereon. One employee submitted a proposed solution of the problem that was confronting him and the other made comments and criticisms thereon.

There is likewise an absence of evidence tending to show that the employee Evans had authority to waive the company's right to discoveries made by other employees while working for the common employer.

■ (c) Was appellant induced to enter the contract because of the fraudulent representations of appellee?

As the basis for the fraud charge, appellant points to that portion of the contract which reads:

"Whereas, said Employer now maintains a bonus plan under and in accordance with which bonuses are awarded and granted to employes who have contributed in an unusual degree to the success of the Employer by their inventions or for other conspicuous service. * * *"

He charges that the company failed to inform him of the details of such plan; that there was no way of his securing the information; and that the plan was such that he was not permitted to share in a bonus although he made an unusual contribution to the success of the company. On this issue the court found,

"Said contract * * * was entered into by both parties in good faith, for a valuable consideration and without any fraudulent representations or any fraudulent concealment and without any intention on the part of plaintiff's predecessor to conceal fraudulently or misrepresent fraudulently the terms and conditions of plaintiff's bonus plan.

Plaintiff's predecessor maintained a bonus plan which was honestly administered and many employees were granted bonuses, in the various years * * *."

Commenting upon this issue the court said,

"* * * Defendant asserts that the contract was obtained from him by fraud. In his first amended answer he alleged that it was deliberately and intentionally represented unto him that plaintiff maintained a bonus plan in which he would participate; that such representation was false and fraudulent, in that plaintiff never had had, and did not have then, any bonus plan. After issue was joined upon this pleading, depositions were taken proving conclusively that plaintiff had since 1923 maintained a bonus plan. Thereupon defendant filed his second amended answer, in which he abandoned the defense that there was no bonus plan but pleaded that the contract had been obtained from him by fraud, in that the details of the bonus plan were kept secret; that it was not disclosed that he would have to stay with the company for seven years to become eligible for a bonus and that such concealment and suppression of the facts amounted to fraud and deception.

"It is horn book law that fraud will never be presumed but must be proved by clear and convincing evidence; * * *

"Defendant says that he read the contract and believed he understood it. No conversation was had concerning the bonus plan. The contract informed him that the condition of such plan was not disclosed, yet he asked no questions concerning same. The contract advised him that he could participate in the benefit of the said bonus under and in compliance with the conditions thereof. He made no inquiry as to such conditions. He was under no compulsion to proceed to work in ignorance of the details of the bonus plan, yet he showed no such interest as would lead him to inquire as to just how it worked. The evidence discloses that there was a bona fide bonus plan in operation during all the years from 1923 on. Apparently the recipients were many and the awards liberal.

"Defendant's termination of his contract with the company was entirely friendly in character. He did not then or at any other time make any claim for bonus allowances or inquiry concerning the same. * * *

"In view of the pleadings of the defendant, the court is driven to the conclusion that the claim of fraud in the alleged concealment of the bonus plan is a mere afterthought; that plaintiff did not willfully conceal the details of the bonus plan from defendant but that the latter never requested information concerning the same, though his contract plainly advised him that any bonus participation would be under the plan and according to the conditions thereof. Had defendant insisted upon knowing the details of the plan before proceeding, had plaintiff refused to divulge the details thereof, a different situation might exist, but as he never made inquiry and voluntarily left the employment without inquiry, it is obvious that his defense of fraud in this respect is not well founded. * * * "

Whether appellant is entitled to share in the bonus plan because of his discoveries is beside the point. He is here seeking to avoid a contract by him made on the ground of fraudulent representations made at the time he executed the contract, and the fraudulent concealment of facts.

Appellant testified, "I then reported for work * * *. I saw Mr. B. * * * He told me to * * * sign the employment contract." He further testified, "The conversation with Mr. B. * * * was very short. He showed me the contract. I read it over carefully and believed that I understood it, and signed it and asked him for a carbon copy of the contract. * * * The copy that was handed to me by Mr. Brown was not signed. * * * "

A careful reading of the appellant's testimony fails to show that there was ever anything said about the bonus. Appellant did not ask about it. The employer did not mention it. There was in fact a real bonus plan in operation at the time. It was, in 1925 (several months after appellant entered upon his employment), modified so as to require two years of service in order that one could participate in the sums distributed each year. It follows that the court correctly concluded that fraud did not vitiate the contract.

The decree is affirmed.