## E. F. DREW & CO., Inc. v. REINHARD.

District Court, S. D. New York.

Nov. 26, 1947.

Harry C. Bierman, of New York City, for plaintiff.

Klein, Alexander & Pohl, of New York City (Fred A. Klein, of New York City, and Guy W. Calissi, of Wood Ridge, N.J., of counsel), for defendant.

GALSTON, District Judge.

The complaint alleges that the defendant entered the employ of the plaintiff, a manufacturer of a variety of chemical products, and that as part of his duty he had "the development of new products, intended for sale to potential customers, and to develop processes for treatment of various substances including water and other liquids."

It is alleged that in the course of his employment and pursuant to those duties, the defendant made an invention relating to a method of purification of water; that the plaintiff caused a proposed application for letters patent to be prepared and requested the defendant to execute such application and an assignment thereof in favor of the plaintiff.

The plaintiff seeks to be adjudged the owner of the invention, and seeks the conveyance by the defendant to the plaintiff of the title to the invention, and the execution of the application for letters patent by him.

The defendant's answer is a denial of the essential allegations of the complaint; and though admitting that he did conceive a method of purification of water, denies that the invention was made in the course of defendant's employment and pursuant to his duties.

The answer also contains a counterclaim in which it is asserted that the plaintiff on or about May 25, 1945, while the defendant was still in the employ of the plaintiff, entered into an agreement with the defendant whereby the defendant agreed to retire as general manager of the American Colloid

Division of the plaintiff's business on May 31, 1945, and the plaintiff agreed to retain the services of the defendant as a consultant at a monthly fee of $1000 for a period of seven months beginning June 1, 1945; and that the plaintiff further agreed to pay defendant 8% of the net profits earned by the American Colloid Division up to and including December 31, 1945. Defendant alleges that he was ready, able and willing to perform said contract but plaintiff discharged the defendant and repudiated the contract.

A second counterclaim sets forth that the plaintiff on or about May 25, 1945, also entered into an agreement for the exploitation and commercialization of an invention made by the defendant for the purification of water and other liquids, and that plaintiff has refused to perform its agreement.

A third counterclaim alleges that defendant had been employed as general manager and vice-president of the American Colloid Division for the year beginning January 1, 1945, to December 31, 1945, at an annual salary of $7500, payable in weekly instalments, and a profit share of the net profits; that the plaintiff paid defendant from January 1, 1945, to June 30, 1945 on account of salary, and that on June 15, 1945, the plaintiff unlawfully discharged the defendant in breach of the contract of employment and has refused to pay the defendant his profit share for the calendar year 1945.

It is important first to determine what the terms of the employment contract were. Bissinger, a vice-president of the plaintiff company, who had been in its employ since 1937 in the capacity of a general executive, said that the defendant was employed as the chief chemist for the American Colloid Corporation, then owned by the plaintiff corporation. Bissinger said that Reinhard was in charge of all technical phases of the business, including the development of products. The Colloid Division at that time, said Bissinger, was principally engaged in the treatment of boiler feed waters, though they also made products for the automotive industry. According to this witness, in the operation of boilers the impurities of the water which is used to make steam come out of solution when the steam is generated and

develop a scale on the inside of the boiler. It is therefore necessary to employ treatment to prevent the accumulation of scale in the boilers. The process employed was to add chemical substances to the boiler water. Bissinger said that all of the products developed and used by the Colloid Corporation were developed by Reinhard. During the time of Reinhard's employment he, under date of February 29, 1944, prepared an inter-office report of suggested projects for investigation and development by the American Colloid Division which included a suggestion of "utilization of a 'magnetic' floc to prevent sedimentation." It is the alleged invention of that process which is the subject-matter of this suit.

Zinzalian, a chemical engineer in the plaintiff's employ, testified that he was in charge of the control laboratory and the research laboratory of the plaintiff. He was informed that Reinhard would be transferred from the New York office to the research laboratory at Boonton. They worked together for several months, beginning in 1944. He said Reinhard guided him in the formulas used in the Colloid Division of the plant. This witness, under cross-examination, admitted that he did not know whether Reinhard had conceived the magnetic floc process.

The third witness called by the plaintiff was a Dr. Taylor, who had been employed as a research director by the plaintiff. He added little to the plaintiff's case, except perhaps that he testified that he saw Reinhard in 1945 doing certain demonstration work in the research laboratory.

The plaintiff called the defendant as a witness, but there was nothing developed through him or any of the other witnesses from which the terms of the employment of the defendant by the plaintiff could be determined. Apparently the plaintiff was content to rest its case on proof of the nature of the activities of the defendant in its behalf.

 Without more, the plaintiff certainly cannot succeed in its cause of action. The controlling authority seems to be United States v. Dubilier Condenser Corp., 289 U.S. 178, 53 S.Ct. 554, 557, 77 L.Ed. 1114, 85 A.L. R. 1488. In that case the action was brought

by the United States against the patentees who were employed in the radio laboratories in the Bureau of Standards, and the question for decision was whether the United States was entitled to a declaration that the Dubilier Condenser Corp. was a trustee for the government, and as such required to assign to the government all its right, title and interest in and to the patents which were issued on the inventions of the two government employees. In the course of the opinion it became necessary for the court to determine what right an employer had in and to an invention made in the course of his employment. Mr. Justice Roberts, speaking for the court, said:

"One employed to make an invention, who succeeds, during his term of service, in accomplishing that task is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. Standard Parts Company v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033. On the other hand, if the employment be general, albeit it covers a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. Hapgood v. Hewitt, 119 U.S. 226, 7 S.Ct. 193, 30 L.Ed. 369; Dalzell v. Deuber Watch Case Mfg. Co., 149 U.S. 315, 13 S.Ct. 886, 888, 37 L.Ed. 749."

Applying those principles to the facts of the case as developed by the plaintiff, it can be said that there is no proof that Reinhard was employed to make an invention. The most that appears from the testimony of plaintiff's witnesses is that as part of his work he was in the laboratory, and wrote a report in which reference is made to the alleged invention which the plaintiff now seeks to obtain from him by compelling first the execution of an application for letters patent, and secondly an assignment thereof. On the other hand, the defendant and his witnesses proved, at least to my satisfaction, that Reinhard entered the employ of the American Colloid Corporation in 1930 and continued in its employ until its merger with the plaintiff in 1942, and then thereafter until he resigned in 1945, and at no time entered into a contract, oral or written, which bound him to assign his inventions to his employer.

■ It is quite clear that he was not employed to develop an invention, nor did he agree to assign any invention that he might make during the period of his employment. It is worth observing, in passing, that in the inter-office letter of January 12, 1945, from Pollack, in charge of research, to Bissinger, reference is made to "library search on applications of magnetite or other magnetic oxides of iron for the purification of waters". Though copies of the letter were addressed to Dr. Zinzalian, Dr. Taylor and a Mr. Volpp, Reinhard was not mentioned. Reinhard's duties were those of a general manager, involving, as he said, "primarily sales work, writing of technical literature, advertising matter, drawing up of forms, establishing methods of analysis and control of boiler water, the handling of salesmen's reports, the management of the office staff, watching expenses, costs, handling formulations, establishing plant control conditions, and in general the general management of the business, with the possible exception of having final say in the matters of finances." His duties remained practically the same up to the time of the severance of his relations on June 5, 1945. He emphasized that only a minor portion of his time was spent in the laboratory, and that he was never requested by the board of directors to engage in research.

Specifically as to the date of conception of the magnetic floc process, Reinhard said that the basic idea predated his employment by the American Colloid Corporation, and carried back to the time when he was a student at Cooper Union Night School, in 1923 and 1924. Speaking of the present time, Reinhard said: "I have not definitely established that the magnetic floc process has been resolved to an invention"; though he was of opinion that on an experimental basic the process worked.

MacKenzie, also employed by the plaintiff during the time that defendant was engaged there, said that it was his understanding that Reinhard was a general manager, and that he had to do with salesmen, purchasing of material, and spent very little time in the laboratory. He said he did discuss with Reinhard a magnetic floc process, "we used to do a lot of our research during after-hours because we had so many things to do during the day, and we would stay in town, have dinner in town, and then go back to work in the lab." At one time in 1937 Reinhard demonstrated the working of the process in the laboratory.

Another employee of the plaintiff, Holmes, said that he saw Reinhard do almost everything that had to be done in the place, but generally speaking his duties were with office routine, writing letters, technical letters, and carrying on correspondence with salesmen, etc.; and on occasion, but seldom, he saw him do some work in the laboratory.

Fisk, another employee of the plaintiff, testified in pretty much the same way, as did Welch in his deposition.

The plaintiff has in my judgment failed not only to establish a contract which entitled it to the assignment of the Reinhard invention (if indeed there is one), but likewise to bring its proof within the principles of United States v. Dubilier Condenser Corporation, supra, or Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560, 32 A.L.R. 1033; and certainly its proof does not come measurably within Flakice Corporation (Del.) et al. v. Short, 2 Cir., 115 F.2d 567, 568. In this last named case the employee was under a contract whereby he bound himself to "assign to this company all property rights in any inventions" connected with the work of the company. See also American Cyanamid Co. v. Hubbell, 3 Cir., 76 F.2d 807.

Nor does the fact that early in the course of his employment by the American Colloid Corporation in 1933 he assigned, with a co-inventor, Frank Amthor, also employed by the American Colloid Corporation, a patent for metal cleansing composition and method issued April 7, 1936, justify the inference that the defendant was obligated to assign other inventions to the plaintiff. See Amdyco Corporation v. Urquhart et al., D.C. 39 F.2d 943; and Bowers et al. v. Woodman, D.C., 59 F.2d 797. Reinhard testified that in these early years the company manufactured a radiator cleaner. He said that he had Amthor in his employ in the laboratory, doing research work under his supervision. Reinhard made various suggestions for improvement to Amthor, and on Reinhard's judgment, without instructions from anybody, he and Amthor made application for letters patent, "so as to leave no question of dispute as to who the inventors might be. Inasmuch as Mr. Amthor had been working under my supervision in the absence of any agreement or understanding to assign patents, again it became apparent and advisable that if such an assignment could be secured on a satisfactory and amicable basis it would be advisable to make the patent that much stronger. That question was broached to Mr. Amthor, and inasmuch as we were both applying, I decided it would be a good example to set if I joined with him in such an assignment."

In respect to the defendant's counterclaim, it would seem that he has not sustained the burden of proof which is placed upon him. It seems reasonable to infer from all the evidence in the case that the defendant became dissatisfied with his association, and that his proposed contract for employment as a consultant, which he had suggested to Drew, was never consummated.

Accordingly, both the complaint and the counter-claims will be dismissed.

Concurrently with the filing of this opinion, appropriate findings of fact and conclusions of law will be filed.