T. Gardner and Alice S. Hill v. Commissioner.
Hill v. Commissioner
Docket No. 94671.
United States Tax Court
T.C. Memo 1963-211; 1963 Tax Ct. Memo LEXIS 133; 22 T.C.M. (CCH) 1056; T.C.M. (RIA) 63211; August 7, 1963
*133 Respondent disallowed business losses taken as deductions by petitioner, a full-time employee (as a supervisor and administrator) of Lockheed Aircraft Corporation. Held, petitioner was engaged in conducting a separate business in the basement of his home as a free lance engineer and inventor and entitled to the business loss deductions. In petitioner's employment contract with Lockheed he executed their usual contract wherein the employee, in effect, agrees to assign patents to employer. By an amendment to the petition, petitioner claimed overpayments because he had reported certain royalty payments from Lockheed as ordinary income instead of capital gains. Held, further, the royalty payments did not constitute consideration for services rendered but did constitute consideration for petitioner's assignment of all of the substantial rights in a patent to Lockheed under section 1235, I.R.C. of 1954, and was therefore to be treated as capital gains. Clarence J. Jackson, 1210 Candler Bldg., Atlanta, Ga., for the petitioners. D. C. Knickerbocker, for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined deficiencies in petitioners' *134 income taxes as originally reported by petitioners for the years 1956, 1957 and 1958 in the respective amounts of $182.80, $353.71 and $204.04. The issue on the determined deficiencies is the correctness of respondent's disallowance of certain sums as business losses. Petitioners filed amended returns for said years claiming refunds for 1956, 1957 and 1958 in the amounts of $646.73, $1,134.77 and $707.14, respectively. A timely amendment to the petition raises the issue that there were overpayments during the years in question. The issue on the amendment to the petition is whether certain sums paid to petitioner T. Gardner Hill by his employer, Lockheed Aircraft Corporation, in the years in question represent compensation for services rendered or consideration for the transfer of a patent under section 1235, Internal Revenue Code of 1954. [1]
Findings of Fact Some of the facts are stipulated and they are found accordingly. Petitioners, T. Gardner Hill and Alice S. Hill, are husband and wife. They filed joint income tax returns for the calendar years 1956, 1957 and 1958 with the district *135 director of internal revenue, Atlanta, Georgia. During the years 1956, 1957 and 1958, petitioners resided at 2664 Ridgemore Road, N.W., Atlanta, Georgia, Petitioners maintained their records and report their income on the basis of the calendar year and the cash method of accounting. T. Gardner Hill, who will sometimes be referred to as petitioner, received a degree in mechanical engineering from Johns Hopkins University in 1934 and a degree in aeronautical engineering from Georgia School of Technology in 1939. After graduation petitioner then worked for Glenn L. Martin Company, Baltimore, Maryland, as an aeronautical engineer. He left the employ of Glenn L. Martin Company in 1947 and entered the private business in Florida of design, consultant and invention as a free lance engineer. Petitioner was engaged in the profession for five years full time as inventor, designer and consultant, during which time he worked on many different projects of his own. During this period he invented and patented, an aluminum type window and a fish lure. In 1952 petitioner went to work full time for Lockheed Aircraft Corporation, Marietta, Georgia. After entering Lockheed's employment petitioner continued *136 to carry on his private business as an inventor and engineer in the basement of his home where he had a shop and office equipment. He did work on and sought to obtain licensees for his window and fish lure inventions. During all of the years in issue he received royalty income from the above inventions and also during said years he invented, patented and tested a water skiing device. In his income tax returns for 1956, 1957 and 1958 petitioner reported business losses in the conduct of his home business in the respective amounts of $591.07, $1,179.05 and $680.13. Attached to each return were what are called "detail sheets" which contained a list of each item of expense and income that resulted in the totals that reflect the claimed business losses. [2] These detail sheets show receipts and expenses as follows: Year
Receipts
Expenses
Balance
1956
$ 520.15
$1,111.22
$ 591.07
1957
665.25
1,844.30
1,179.05
1958
1,148.92
1,829.05
680.13 In his notice of deficiency for each of the years *137 respondent disallowed the sums of $591.07, $1,179.05 and $680.13, the computation stating "Amount claimed as 'Loss from business' disallowed." The Explanation of Adjustment appearing on the notice of deficiency is as follows: (a) It is held that the amounts of $591.00, * *138 $1,179.05, and $680.13 deducted by you in your 1956, 1957 and 1958 returns, respectively, as "Loss from business" do not constitute properly allowable deductions as "Losses incurred in Trade or Business"; that the expenditures claimed in your 1956, 1957 and 1958 returns as the basis for the computation of "Loss from business" do not represent amounts properly deductible as "Research and Experimental Expenditures"; and that, in any event, you have failed to satisfactorily show that, during the years 1956, 1957, and 1958, you paid or incurred any properly deductible "Ordinary and Necessary" business expenses in excess of the amounts of royalty income shown in the schedules attached to your 1956, 1957 and 1958 tax returns and designated as "Detail Sheet C", "Sheet 1" and "Detail Sheet 2", for the three years respectively. Sections 162, 165, 174 and 262 of the Internal Revenue Code of 1954. As stated, in 1952 petitioner went to work for Lockheed Aircraft Corporation, Marietta, Georgia. He was employed full time as a design group engineer, which included supervision and administrative duties, and his job was not covered by the Lockheed Union Contract. As a condition precedent to employment by Lockheed, petitioner executed an agreement to assign to Lockheed all property rights in inventions and discoveries conceived or made by him while in their employ and for six months thereafter, but limited to matters relating to the business of the Company, to aircraft and the field of aviation. The agreement became known within Lockheed as the "Assignment of Inventions Agreement." All employees of Lockheed, whether salaried, hourly, union or nonunion were and still are required by Lockheed to execute the agreement at the time of entering employment with the Company. The Assignment of Inventions Agreement provides, in part, as follows: I, the undersigned, as a condition precedent to my employment by the LOCKHEED AIRCRAFT CORPORATION and/or its subsidiaries hereinafter called the Company, and in part consideration for wages or salary paid to *139 me in event of such employment, agree as follows: I. All improvements, inventions and discoveries, hereinafter called inventions, conceived or made by me either alone or with others, during the period of my employment and up to and including a period of six (6) months after termination thereof and whether or not conceived or made during my regular working hours of such periods, shall be and are the sole property of the Company. * * *
III. I will disclose promptly and in writing to the officials designated by the Company to receive such disclosure, all such inventions which I alone or with others, may conceive or make, and I hereby assign and agree to assign all my right, title and interest in and to such inventions to the Company, and I agree not to disclose any thereof to others, without express consent of the Company, except as required in the line of employment. IV. During my employment by the Company or at any time thereafter, I will, upon request of the Company, execute specific assignments of any of said inventions as well as execute all papers and perform all lawful acts which the Company deems necessary or advisable for the preparation, prosecution, issuance, procurement and/or *140 maintenance of patent applications and patents of the United States and/or foreign countries for said inventions and for the transfer of interests therein and will execute any and all papers and lawful documents which shall be required or necessary to vest title in the Company in said inventions, patent applications, patents and interests therein. * * *
At the time petitioner went to work for Lockheed, the Company had in force what is known as LockheedPatent Plan. The Patent Plan is described in a seven page printed brochure prepared by the Patent Section of the Legal Department of Lockheed Aircraft Corporation. It recites in the "Foreword" that the plan will be of particular benefit to the employee and it is hoped the plan "will act as an incentive for all employees to do original thinking." The brochure states the purpose and scope of the plan will be as follows: PURPOSE The purpose of the Patent Plan is to encourage employees of Lockheed in the development of new and better products and processes of manufacture in an effort to further the progress of the Company and the industry. It provides for the payment of cash awards and a percentage of royalties to employees who make patentable *141 inventions. It is open to all company employees. SCOPE Any inventions or improvements in the design of aircraft, methods or processes used in its manufacture, or other items, which are believed to be new and useful, and usable by the Company in its products or operations, should be submitted to the Company by making a disclosure, to the Patent Section, of each such invention or improvement. Inventions or improvements clearly outside the scope of Company interests, products or operations may likewise be submitted, if desired, to the LockheedPatent Section at the option of the inventor or proposer. Every effort will be made to be as helpful as possible in such cases, but no obligation rests on the Company to undertake the exploitation and development of such proposals. Such disclosures are of possible future value to the individual as evidence of the date the intention was disclosed to others. The brochure goes on to urge early and complete disclosure to the employee's supervisor or the Company Patent Section on a Company "Disclosure of Invention" form. The Patent Section will then make an investigation, including Patent Office search and "will determine the extent of novelty in the *142 invention and the possibility of obtaining a patent on it. Inventions of limited merit or usefulness will not necessarily be investigated." The brochure states what the Company will do if it determines the invention has merit and is patentable, as follows: PREPARATION AND PROSECUTION OF PATENT APPLICATION If it is decided that the invention is of sufficient value to apply for patent, an application will be drawn up and filed in the United States Patent Office in the inventor's name. All costs for making application, including Government fees, will be paid by the Company. When the application (original, divisional and/or a continuation) is prepared, an assignment to the Company will be submitted to the inventor-employee for his signature in accordance with the Assignment of Inventions Agreement, which the employee signs upon the occasion of his original employment. Also at such time a first payment of $50.00 will be made to him. The application will be filed and patent applied for by the Patent Section which will handle all proceedings in conjunction with obtaining the patent. If the application (original, divisional and/or a continuation) is allowed and the patent issued, the inventor-employee *143 will be so notified and a second payment of $100.00 will be made. INCOME PARTICIPATION In the event any revenue or royalties may be received by Lockheed as a result of sale or license of inventions to other parties, excluding subsidiaries of Lockheed Aircraft Corporation, the inventor-employee will share in such revenue or royalty in accordance with the following schedule: On the first $100,000 received
20%
On the next $400,000 received
10%
On any further sums in ex-
cess of $500,000
5% The employee-inventor will share in revenue or royalties for the life of the patent, whether or not he remains with the Company. In the event of his death before the patent expires, his legal heirs will receive the continuing awards. All deductions required by law will be made at the time the awards are paid. The brochure goes on to provide for possible favorable consideration of release to the inventor-employee of a proposed undeveloped invention which might be technically within the scope of the Company's interests "withholding a shop-right." It is stated that Lockheed, as a member of Manufacturers Aircraft Association, Inc. and as a Government contractor, has certain obligations with respect to licensing *144 and cross-licensing of certain patents and processes and its Patent Plan provisions are subject to such obligations. The last two paragraphs of the brochure are as follows: SALES AND LICENSES It is understood and agreed that Lockheed shall have absolute discretion in the matter of sale and licensing of inventions, and may report any invention or improvement to the Manufacturers Aircraft Association, either with or without claim for compensation, or sell any invention or improvement, or license its manufacture for such price or royalty, if any, as the Company may determine. In any event, the inventor-employee shall have no claim against Lockheed under any of the provisions of this Plan except for his share of net revenue or royalties actually received by Lockheed. CANCELLATION The Patent Plan may be amended or discontinued at any time by the Company, provided that any amendment or cancellation shall neither affect nor disturb any existing patent licenses then in force and the royalty payments due, or to become due thereon. While employed by Lockheed, T. Gardner Hill conceived, invented and perfected a new and different type of flexible ducting compensator. The patent application was *145 filed in the United States Patent Office on June 7, 1954 and issued as United States Letters Patent 2,942,896 on June 28, 1960. As soon as the application for a patent was prepared, T. Gardner Hill executed a specific assignment of the invention to Lockheed in accordance with the Assignment of Inventions Agreement. The form of the above assignment is as follows: ASSIGNMENT WHEREAS, I, , residing at , County of , State of , have invented a new and useful , for which I am about to make application for Letters Patent of the United States; and WHEREAS, LOCKHEED AIRCRAFT CORPORATION, of Burbank, County of Los Angeles, State of California, is desirous of acquiring an interest therein; NOW, THEREFORE, for valuable consideration, receipt of which is hereby acknowledged, I,…, do hereby sell, assign and transfer unto said LOCKHEED AIRCRAFT CORPORATION, its successors and assigns, the full and exclusive right for the territory of the United States of America and for all foreign countries, in and to the said invention as described in the specification executed by me on this… day of…, 19 , preparatory to obtaining Letters Patent of the United States therefor; said invention, application and Letters *146 Patent to be held and enjoyed by the said LOCKHEED AIRCRAFT CORPORATION for its own use and behoof, and for its legal representatives, to the full end of the term for which said Letters Patent may be granted, as fully and entirely as the same would have been held by me had this assignment and sale not been made. WITNESS my hand at…, this… day of…, 19 . Under the terms of the Patent Plan, T. Gardner Hill received a payment of $50 as an award upon filing of the patent and when the patent was issued on the application he received a second payment of $100. These two payments are not in issue since they were made prior to the years in issue. Lockheed licensed the invention of T. Gardner Hill to other concerns and under the terms of the Patent Plan he shared in the revenue received by Lockheed. T. Gardner Hill received payments from Lockheed under this arrangement in the total amounts of $4,313.51 in 1956; $6,274.61 in 1957 and $3,356.58 in 1958. The payments were by separate vouchers delivered to him quarterly bearing a notation identifying the check as petitioner's "share of royalties" received from a named Lockheed licensee of the patent. Lockheed deducted taxes withheld while he was *147 an employee but when he left Lockheed for a time in 1960-1962, the royalty checks were the gross amount without tax withholding. Petitioner included the payments received as a result of the patent as ordinary income on his original 1956, 1957 and 1958 tax returns. On April 13, 1959 he filed amended returns for each of the years 1956, 1957 and 1958 and excluded from his Lockheed compensation income the amounts of these patent payments received by him during these three years. By an amendment to his petition he alleges overpayments in that such amounts should be properly reported as long-term capital gain rather than compensation. Opinion At the outset we experience some difficulty in relating respondent's position on brief with respect to the deficiency issue and his determination of deficiency. Respondent's determination disallows the amounts petitioner claimed as business losses. These amounts were net losses or the difference between alleged business expenses and alleged business income. Respondent's determination was presumably under subsections (a) and (c)(1) of section 165, which provide "[there] shall be allowed as a deduction any loss sustained during the taxable year * * * *148 [in] the case of an individual * * * incurred in a trade or business; * * *". On brief he argues petitioner "did not incur deductible losses in the operation of a trade or business" because "A. Mr. Hill was not carrying on a trade or business * * * separate and apart from his occupation as an employee of Lockheed" and "B. Mr. Hill did not incur ordinary and necessary business expenses in excess of the rovalty income shown on the detail sheets attached to the respective returns." Our first observation is why, if respondent feels there was no separate business engagement, he did not disallow all of the claimed business expenses. Surely they should all be disallowed as personal expenses under section 262 if petitioner was not engaged in an independent business. Respondent's determination practically admits petitioner carried on a separate business and yet his first argument on brief is that he did not. If under such a determination of deficiency petitioner had any burden to show his engagement in a separate business, we hold he sustained it. It is stipulated that "[prior] to his employment by Lockheed in 1952, he had operated independently as a free lance engineer, engaged in the design, *149 development and invention of certain items." He testified that after his employment with Lockheed he continued in the same business part time instead of full time. During the years he devoted full time to the business he had invented an aluminum awning type window. He testified as to the time he spent during the years in question on this project and on the fish lure that he had also invented when he lived in Florida. He sought licensees, made mock-up of parts, conferred with people he had under contract "as to how they would tool up", made tests and had conferences with producers and solicited prospective licensees. He worked up brochures and instruction sheets and he entered into a license contract with respect to the window on a royalty basis whereby he received $1,000 lump sum (reported in his 1956 return) at the beginning and then royalty payments if the licensee manufactured it. In all of the returns for the years in question he reports royalty income from the fish lure and he testified most of his work in connection with the fish lure was to secure additional licensees. Also during the years in question he worked on and patented a water ski device which did not produce income *150 during the years in question. The evidence is sufficient to establish the separate business engagement. It will be remembered that attached to each income tax return were detail sheets listing each item of business expense and income. Respondent's notice of deficiency does not indicate that if it be held petitioner was conducting a separate business, then certain expense items should be disallowed. His notice merely indicates the sum of allowable expenses for each year sho1ld be reduced to an amount equal to business income And yet respondent argues on brief that his determination casts on petitioner the burden of establishing that each one of the hundreds of items of expense (which he admits were paid) "represented ordinary and necessary business expenses." And his argument is that petitioner failed in his burden of proof to show that items in the detail sheets falling into the categories of automobile expenses, electricity and other utility expenses, travel and entertainment, supplies and dues, and depreciation, were ordinary and necessary business expenses. The effect of his determination is that it concedes expenses up to the amount of business income are ordinary and necessary *151 business expenses. From such a determination petitioner could get no inkling as to the business expense items respondent would concede or disallow. Such a determination as here made casts on petitioner no burden of establishing the business connection of each and every listed expense item. If it be thought he had any burden at all with respect to establishing his business expenses, we feel he satisfied it with his general testimony concerning his conduct of his business. Petitioner testified that he kept a record of his expenditures: "[on] items that were specific and could be identified, such as raw materials purchased for the mock-up of a part, they were identified as to the exact item. On things like utilities I had to estimate and I made a spot check and just used a straight percentage for that." He testified he used an account number to identify each one of his projects and this account number was identified in a column on the detail sheets attached to the returns. He testified his "spot check" yielded a figure of something more than 20 percent of business use of electricity, telephone and one of his two cars but he used 20 percent of total expenditures in computing these business *152 expense items. He testified the expenditures were made by checks. We hold he was not required to testify with respect to each of the hundreds of expenditure items in the detail sheets. He sustained any possible burden he might have by reason of such a notice of deficiency as respondent rendered. He was entitled to the business loss deductions. The issue raised by petitioner's amendment is whether the payments made to petitioner by Lockheed under its Patent Plan were "payments in consideration" of petitioner's transfer to it of "all substantial rights to a patent," within the provisions of section 1235. [3] *153 If they were, then such payments were entitled to capital gains treatment. We start with the admitted fact that petitioner did transfer all substantial rights to the patent to Lockheed. Respondent makes an argument that the specific assignment petitioner executed about the time he signed the patent application did not accomplish a transfer because Lockheed had acquired "ownership" of the patent by virtue of the earlier employment agreement embodying the general Assignment of Inventions Agreement. But that argument merely admits there was an assignment or transfer of the patent though under an earlier agreement. [4]It is of no consequence that the assignment was a condition precedent to employment, or required, or deemed effective at the moment the invention is conceived, or voluntarily made thereafter. Roland Chilton, 40 T.C. - (June 21, 1963). Where there is a transfer of all the patent rights, the only issue is whether the amounts paid are "in consideration of such transfer" within the meaning of section 1235, *154 supra. Respondent makes a short argument to the effect that the payments under the plan were "intended to represent compensation for services rendered rather than consideration for the transfer of a patent." [5] *156 This Patent Plan under which the payments were made was in operation since long before petitioner's employment in 1952. He was not hired to invent so that the wages he received could be said to be consideration for inventions he produced, as was the case in Standard Parts Co. v. Peck, 264 U.S. 52, and Arthur N. Blum, 11 T.C. 101, cited by respondent. He testified his job with Lockheed "entailed the supervision and administration of a group of design engineers which included the supervision of the design and the administration of their requirements." In other words, he was hired to render services as a supervisor and administrator. In common with all of Lockheed's employees, he was urged, as the foreword of the Patent Plan states, "to do original thinking" which might contribute *155 to the continued success of the company by resulting in a patentable invention that the company might wish to develop. The Patent Plan, in effect, tells all employees that if his inventive thought does result in an invention which Lockheed thinks is valuable, Lockheed will take the invention by specific assignment "in accordance with the Assignment of Inventions Agreement" and use, sell, or license it, and pay the employeeinventor a share of sale price or royalties it receives by way of sale or license over the life of the patent. In effect, Lockheed hired petitioner as a supervisor and manager at a certain salary, with the added agreement that certain patentable inventions would be transferred to Lockheed in consideration of certain payments (which had no connection with his salary payments) contingent upon Lockheed selling or licensing the invention. Lockheed did license and did make the agreed payments and therefore the payments in question which petitioner received were consideration payments for his patent assignment. We hold for petitioner on the issue. Section 1235, supra, is applicable and the payments represent long-term capital gains. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.↩
2. In view of our disposition of the case it will not be necessary to set out these detail sheets. Photostatic copies of the sheets were the subject of joint exhibits but whole pages of the exhibits are completely unreadable.↩
*. No explanation appears as to why the amount of seven cents was dropped.
3. SEC. 1235. SALE OR EXCHANGE OF PATENTS. (a) General. - A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. (b) "Holder" defined. - For purposes of this section, the term "holder" means - (1) any individual whose efforts created such property, or * * *↩
4. The only way Lockheed could obtain the patent rights would be by a transfer or assignment since a corporation cannot apply for a patent. Section 8, Article 1, U.S. Constitution; 35 U.S.C.A., Sec. 111↩.
5. Respondent does not cite or discuss his regulation ( Sec. 1.1235-1(c)(2), Income Tax Regs.↩) upon which he mainly relled in Roland Chilton, 40 T.C. - (June 21, 1963).